[Civ. No. 26692. Second Dist., Div. Two. May 21, 1963.]

FIRST WESTERN BANK AND TRUST COMPANY, as Administrator With the Will Annexed, etc., Plaintiff and Appellant, v. FLORENCE W. SCOTT, Defendant and Appellant.

Krag & Krag and Donald R. Krag for Plaintiff and Appellant.

Jay D. Rinehart and W. J. Schmitt for Defendant and Appellant.

HERNDON, J.—By the instant action, plaintiff Nancy E. Scott, as special administratrix of the estate of Harold Hill Scott, deceased, sought a declaratory judgment and other equitable relief upon the basis of plaintiff's interpretation of the provisions of a property settlement agreement between said decedent and his former wife, the defendant Florence W. Scott. Said agreement was dated and purportedly was effective as of November 1, 1949, although it was executed on March 18, 1950. After a nonjury trial, the court below filed its findings of fact and conclusions of law and entered its judgment in favor of defendant, decedent's former wife. Thereafter, the trial court granted plaintiff's motion for a new trial on the ground that the evidence was insufficient to support the judgment. Defendant has appealed from the order granting the new trial and plaintiff has taken a cross-appeal from the judgment.[1]

Except with respect to the determinative issue as to the *intent* of the parties to the agreement, all material facts relating to the acts of the parties are undisputed and were established by documentary evidence. The property settlement agreement contained, *inter alia,* the following provisions.

"From this date forward, each of the parties shall have the right to dispose of all of his assets and estate by Will, and each party waives any right to inherit from the other or to be appointed Executor or Administrator of the estate of the other, or to petition for or to receive any family allowance or probate homestead upon any property of the other, or to claim or have any community property interest in any property acquired or owned by the other except that either party may take such benefits as may be provided, if any, under the terms of the Last Will and Testament of the other. . . .

"Any and all property and earnings acquired or received by either of the parties from any source or by any means after the date of this Property Settlement Agreement shall be the sole and separate property of the party acquiring or receiving the same, and each of the parties respectively grants, quitclaims and releases to the other all such acquisi-

---

[1]The record before us reveals that following the order granting a new trial, but prior to the filing of the notices of appeal, an order was made substituting First Western Bank and Trust Company as administrator with-will-annexed, in the place and stead of plaintiff, Nancy E. Scott. However, all proceedings here presented for our review having occurred prior to this substitution, for purposes of clarity respondent and cross-appellant will be referred to as "plaintiff."

tions of property and all earnings of the other from this date forward, to be the sole and separate property of the party acquiring or receiving the same. . . .

"Each of the parties accepts the division of property and the covenants and agreements herein contained in full payment, settlement and discharge of all of his community property and other property rights against the other and any and all rights to support or maintenance beyond the covenants herein contained, and the property settlement which is herein agreed upon shall be a full and final settlement and the determination of all community property rights between the parties, and the property remaining in the possession of each of the parties after such settlement shall be and remain the separate property of the party possessing the same and the other party expressly waives and relinquishes any and all community property or other right therein. . . .

"The husband has had the principal management and control of the community property of the parties and certain items thereof have been placed in joint tenancy for purposes of convenience but all of the property hereinafter referred to represents the proceeds of the earnings of one or both of the parties during their marriage and all is community property, subject to the jurisdiction of the Superior Court in any action involving the marital status of the parties, for division or apportionment between them. . . .

"The wife transfers, assigns, releases and quitclaims unto the husband all of her right, title and interest in and to the following items of property which have heretofore been held as community property of the parties or which represent the proceeds of such community property: . . . (i) One-half (½) of the capital stock of Monrovia Apartments, Inc., a corporation, heretofore owned by, or planned to be issued to, the parties to this agreement or either of them, which one-half of said stock amounts to —— shares. . . .

"The husband transfers, assigns, releases and quitclaims unto the wife all of his right, title and interest in and to the following items of property which have heretofore been held as community property of the parties or which represent the proceeds of such community property: . . . (j) One-half (½) of the capital stock of Monrovia Apartments, Inc., a corporation, heretofore owned by, or planned to be issued to, the parties to this agreement or either of them, which one-half of said stock amounts to —— shares. . . .

"Each party acknowledges that he has read the foregoing agreement and fully understands the contents thereof and accepts the same; that there has been no promise, agreement or undertaking made by either of the parties except as set forth herein, relied upon by either as a matter of inducement to enter into this agreement. Each party has been independently advised by his attorney as to the legal effect of this agreement and each of its provisions, and the advisability of executing the same...."

All of the stock in Monrovia Apartments, Inc., was owned by the parties, the deceased husband being president, and defendant secretary-treasurer. On August 16, 1949, the parties, as officers of the corporation, had issued to themselves 40 shares of its common stock as tenants in common and 215 shares of its preferred stock as joint tenants. A technical error in the amount of the reserve for replacement provided for in the corporation's articles was subsequently discovered and the Federal Housing Administration requested that they be amended to effect a correction.

The articles were amended on February 3, 1950, and an application thereafter was made to the Division of Corporations for permission to cancel the original certificates and to issue new certificates to the same parties with notations thereon regarding the amendment of the articles. This application was granted on March 28, 1950, and appropriate orders were made authorizing the cancellation and reissuance of the outstanding stock.

Neither the permit of August 12, 1949, nor the permit of March 28, 1950, set forth any directions or restrictions with respect to the form in which title to the stock was to be taken by the parties. However, on March 31, 1950, decedent and defendant, signing as president and secretary, respectively, caused to be issued to themselves new certificates evidencing their ownership of the 40 shares of common stock and 215 shares of preferred stock and designating them as *joint tenants*.

Before proceeding further, it might be well to examine the legal aspects of the transactions thus far described, insofar as they relate to the ownership of said corporate stock, the only property in issue in the instant action. From the documentary evidence introduced, it is clear that, prior to the effective date of the property settlement agreement, whether it was November 1, 1949, or March 18, 1950, a court inquiring

into the question of ownership would have been bound to hold that the stock then held by the parties in joint tenancy form was *in fact* their joint tenancy property in the absence of some competent evidence that the parties entertained a different intent.

"The presumption is that a deed is what it purports to be and one who seeks to overcome such presumption has the burden of producing clear and convincing proof. [Citations.] Also, it is true that, 'The fact that a deed "was taken in joint tenancy established a prima facie case that the property was in fact held in joint tenancy." ' [Citation.]" (*Arsenian* v. *Meketarian,* 138 Cal.App.2d 627, 631 [292 P.2d 293].)

Of course, it is undeniable that the above quoted terms of the property settlement agreement provided evidence sufficient to rebut the presumption arising from the form of the certificate if either of the parties thereafter had contended that the property always had been true joint tenancy property and not community property. That is, the parties made it abundantly clear that, for the purpose of dividing their property as described in their agreement, all such property was to be deemed their *community* property, notwithstanding that certain items thereof previously had been placed in joint tenancy form merely "for purposes of convenience."

Further, a strong inference can be drawn from the provisions of the agreement that its intended purpose, and its actual effect, were to terminate any form of cotenancy ownership which otherwise might have been indicated by the form of then outstanding stock certificates. Thus, as stated in *Estate of Sears,* 182 Cal.App.2d 525, 529 [6 Cal.Rptr. 148], " '[i]t is settled that the separate property of husband or wife may be converted into community property or *vice versa* at any time by . . . agreement between the spouses.' The change over may be made although title to the property may remain of record in joint tenancy. [citation], or . . . in the name of one of . . . the spouses."

The objective of an agreement to transmute the ownership of property is fully accomplished when the agreement expressing that intent is executed, because it operates immediately to transmute and convert the property of the spouses into the intended type of ownership, and nothing further remains to be done. (*Estate of Sears, supra,* p. 530; *Estate of Raphael,* 91 Cal.App.2d 931, 939 [206 P.2d 391].) It

is not unusual, however, for a husband and wife, faced with an apparent failure of their marital relationship, to determine and agree upon their property rights, particularly in community owned business enterprises, by agreeing that each party thenceforth shall own one-half thereof as his or her separate property, but that they will hold it in joint tenancy.

It is therefore clear that the principal issue presented to the trial court was the question as to what the parties intended to accomplish when they caused the new certificates to be issued approximately two weeks after the execution of the agreement. The pleadings and pretrial orders clearly show plaintiff's contention that this reissuance had been effected solely to conform to a technical change in the articles of the corporation, that the new certificates merely had reflected the cotenancy title appearing on the original certificates, and that the parties entertained no intent that the stock would thereafter be held in joint tenancy contrary to the plain intendment of the property settlement agreement which they had executed so recently.

Defendant, on the other hand, relied upon the fact that the certificates actually had been reissued after the execution of the agreement and urged that this reissuance gave rise to the presumption that the form of ownership intended was that indicated by the new muniment of title, and that the subsequent conduct of the parties supported this presumption.

Plaintiff in support of her contentions offered only the documents above described and (1) a Nevada judgment of divorce granted to defendant in May 1957, wherein the property settlement agreement was referred to, confirmed, and approved, and the parties were ordered to comply with all its terms and provisions; and (2) an holographic will executed by the deceased husband on July 1, 1959, whereby he purported to bequeath his interest in the corporate stock, stating: "Said stock is presently held 50% by myself and 50% by Florence Scott."

Clearly, the Nevada divorce decree had no bearing upon the ownership of the stock, except insofar as it constituted judicial approval of the division of the property previously effected by the parties prior to the reissuance of stock certificates in their names as joint tenants. The cases cited by plaintiff relating to the merging of claims or executory provisions of property settlements into subsequent judgments are not in point.

At most, the husband's will merely indicated a belief on his part that he had power to make a testamentary disposition of his interest in the stock. Being merely a unilateral pronouncement by the husband, obviously it consistuted no evidence of any *agreement* to change the joint tenancy ownership of the stock if such joint tenancy had been reestablished after the execution of the property settlement agreement.

Defendant, in support of her position, introduced the testimony of the manager of the apartments owned by the corporation, and of the adult son of the parties. The substance of this testimony was that the husband, in the years preceding his death in June 1960, expressly stated that he knew the property would pass to defendant upon his death, and that he intentionally had refrained from severing the joint tenancy holding of the stock because he realized that he had treated defendant shabbily and had forced her to live on a meager income for years by failing to pay her the alimony agreed upon in the property settlement agreement.

At the close of the case, the court made findings and conclusions to the effect that the parties, following the execution of the property settlement agreement, had "conveyed their separate interests in said corporation stock into joint tenancy" and that such joint tenancy never had been terminated prior to the husband's death. Judgment, accordingly was entered for defendant.

However, as heretofore indicated, plaintiff thereafter moved for a new trial on the grounds of the insufficiency of the evidence, and that the decision was contrary to law. In granting the motion, the court made its order in the following language: "The court rendered judgment in favor of the defendant, based on the assumption that the defendants, Florence W. Scott and Harold Hill Scott, at the time the two new stock certificates were issued by them, fully understood and realized the significance of their acts. This assumption is not supported by any evidence in the record and becomes a vital issue to be determined, in the light of all the evidence in the case. Plaintiff's motion for a new trial is granted on the ground of insufficiency of the evidence to justify the verdict."

The fact that during the period of their marriage the parties had engaged in the many real property transactions disclosed by the property settlement agreement constituted a strong basis for an inference that they fully understood the various forms of property ownership. In addition, the testimony of defendant's witnesses placed an abundance of evi-

dence in the record to support the finding that the husband not only knew that the stock still stood in joint tenancy, but that he understood the consequences of a failure to terminate this tenancy.

For present purposes, it may be assumed that the granting of the new trial would have to be held erroneous if this statement by the trial court were construed as a decision that even if the deceased in fact had intended again to place the stock in joint tenancy, and had failed only to appreciate the legal consequences of such cotenancy, that this mistaken belief of the deceased would permit an avoidance of these consequences. (*Socol* v. *King,* 36 Cal.2d 342, 345, et seq. [223 P.2d 627].)

We may not, however, presume error on the part of the trial court. Further, since there was some evidence in the record from which the knowledge of the parties concerning the legal aspects of a joint-tenancy holding could be inferred, it appears quite probable that the court's comments had reference to the absence of evidence in the record with respect to the events connected with the actual reissuance of the stock.

Although it is true that the mere existence of stock certificates issued after the execution of the property settlement agreement ordinarily would create a presumption as to the intent of the parties, (cf. *Wynn* v. *Wynn,* 170 Cal.App.2d 484, 487 [338 P.2d 930]; *Brazil* v. *Brazil,* 137 Cal.App.2d 144, 147 [289 P.2d 807]) nonetheless, this presumption is a rebuttable one, and where there is conflicting evidence, the resolution thereof is a matter solely within the province of the trial court. (*Crook* v. *Crook,* 184 Cal.App.2d 745, 747-748 [7 Cal.Rptr. 892].) In the instant case the documents in evidence and the provisions of the property settlement agreement wherein each of the parties quitclaimed one half of the stock to the other, and which referred to stock "owned by *or planned to be issued to,* the parties . . ." constituted a source from which conflicting inferences reasonably could be drawn.

It is true, also, that defendant's witnesses gave testimony which, if credited by the trier of the facts, established that the deceased knew the stock was in joint tenancy and for many years intentionally took no steps to alter this arrangement. However, as this court recently noted in *Fairfield* v. *Hamilton,* 206 Cal.App.2d 594, 601 [24 Cal.Rptr. 73], the controlling rules on an appeal from an order granting a

new trial on the ground of insufficiency of the evidence to justify the verdict are set out in *Yarrow* v. *State of California*, 53 Cal.2d 427 [2 Cal.Rptr. 137, 348 P.2d 687], at pages 434, 435, as follows:

"In considering the sufficiency of the evidence on the hearing of a motion for new trial it is the exclusive province of the trial court to judge the credibility of the witnesses, to determine the probative force of testimony and to weigh the evidence, and it may draw reasonable inferences therefrom opposed to those drawn by the trier of fact at the trial. [Citations.] ▆▆▆ It is only where it can be said as a matter of law that there is no substantial evidence to support a contrary judgment that an appellate court will reverse an order granting a new trial on this ground. [Citations.] ▆▆▆ Error is not presumed and the burden is upon the plaintiffs herein to affirmatively show its presence in the record [citations]; or a manifest and unmistakable abuse of discretion. [Citations.] ..."

▆▆▆ Actually, appellant appears to recognize the futility of arguing that there is no evidence in the record that would support a contrary judgment; her basic contention seems to be that the question of the intent of the parties was not an issue before the court. In this she definitely is in error. Among the issues set forth in the joint pretrial statement of the parties, which was incorporated into the pretrial order, is the following: "4. Whether or not the subject capital stock was reissued in joint tenancy by reason of the fact that the original issue was made in joint tenancy."

▆▆▆ Since the trial court indicated that it originally rendered judgment on an "assumption" not based upon the evidence relating to this most vital issue, we cannot hold that its subsequent determination to grant a new trial constituted an abuse of discretion. ▆▆▆ Since the order granting the new trial must be affirmed and since this automatically vacates the judgment, plaintiff's appeal from the judgment is moot and must be dismissed. (*Lee* v. *Cranford*, 107 Cal.App.2d 677, 681-682 [237 P.2d 986].) The order granting a new trial is affirmed and the appeal from the judgment is dismissed.

Fox, P. J., and Ashburn, J., concurred.