[Crim. No. 3841. Fourth Dist., Div. Two. May 19, 1970.]

THE PEOPLE, Plaintiff and Respondent, v.
JOSEPH JAMES ANTHONY, Defendant and Appellant.

## COUNSEL

Herbert A. Moss, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Frederick R. Millar, Jr., Deputy Attorney General, for Plaintiff and Respondent.

## Opinion

**KAUFMAN, J.**—Defendant was charged by information with the crimes of robbery (count I, Pen. Code, § 211) and kidnaping for the purpose of robbery (count II, Pen. Code, § 209) and with being armed with a deadly weapon at the time of the commission of the offense. Defendant's motions under sections 995 and 1538.5 of the Penal Code were denied, and, in a jury trial defendant was found guilty on both counts. The robbery was found to be first degree, and, with respect to count II, the jury found it true that defendant was armed with a deadly weapon. Defendant's motions for new trial and to institute narcotic addiction proceedings were denied. Judgment was pronounced, and defendant was sentenced to prison for the term prescribed by law on each count. Execution of the sentence on count I, however, was suspended until such time as sentence and conviction on count II should become final, suspension at that time to become permanent. Defendant appeals from the judgment of conviction.

Defendant contends that substantially all of the incriminating evidence admitted at the trial was the product of an unlawful search and seizure; that his in-the-field identification at a time when he was unrepresented by counsel constituted a deprivation of his right to counsel; and that the in-the-field identification was so unnecessarily suggestive as to deprive him of due process of law. It is also necessary that we review defendant's conviction of kidnaping for the purpose of robbery in light of *People* v. *Daniels,* 71 Cal.2d 1119 [80 Cal.Rptr. 897, 459 P.2d 225].

### The Facts

John C. Branham, Jr., a United States Marine Corps sergeant, was working at a gas station located at the intersection of First and Raitt Streets in Santa Ana. At about 3 a.m. on February 1, 1969, defendant entered the station office and, holding a cocked, loaded chrome revolver in his hand and pointing the revolver at Sergeant Branham, defendant demanded that Branham give him money, which he did. The amount taken in the robbery was $96 and some cents, including three rolls of quarters, which had been on the back counter of the station, wrapped in standard coin wrappers by Sergeant Branham and which were found to be missing after the robbery.

After Sergeant Branham handed over the money, defendant, who still had the gun, ordered Sergeant Branham around back of the station into a rest room, a distance of 30 to 45 feet from the office. Defendant told

Branham that if he stuck his head out, defendant would blow it off. After the door shut, Sergeant Branham heard footsteps running east, toward Raitt, and dogs barking. After remaining in the rest room approximately 15 to 20 seconds, he left and went back to the office, where he immediately reported the robbery to the police by telephone. He had not seen or heard anything indicating the use of an automobile in connection with the robbery.

On the telephone he described the person who had robbed him as a male Negro, 5 feet 8 inches to 5 feet 10 inches tall, with a mustache, and wearing a cap and bluish-gray zipper jacket. He also gave the police a description of the gun, but did not mention the rolls of quarters. While still on the telephone, and at most one minute after he left the rest room, Sergeant Branham saw two police vehicles on the street in front of the station. One, a marked vehicle, was westbound on First Street and the other, an unmarked vehicle, made a U-turn and came back past the station, headed west on First Street.

Officer Foley of the Santa Ana Police Department was patrolling in an unmarked police vehicle directly in front of the service station, eastbound on First Street, when he received a radio call from the Santa Ana police station about the robbery.[1] On receiving the call, Officer Foley looked at the gas station, saw no one, and remembered that, seconds before, he had seen a Pontiac automobile on Townsend Street, two or three blocks away. His attention had been attracted to this vehicle because it had been the only automobile on the streets and was considerably damaged in the rear portion. This was the only automobile Officer Foley had seen in the area during the immediately preceding five minutes. Many of the surrounding streets, including Townsend, are dead end streets, and First Street is one of the few through streets in the immediate vicinity of the gas station.

At this moment, Officer Pennington of the Santa Ana Police Department passed Foley going west on First Street. Officer Foley made a U-turn behind Pennington and by radio simultaneously relayed to him and all cars in the area a description of the automobile he had seen. Foley testified that he could still see the Pontiac as he made the U-turn and kept it in view continuously from that time until it was overtaken. It was proceeding west on First Street away from the gas station. Foley told Pennington to "get that car."

Officer Pennington received a radio call about the robbery at about 3 a.m. He saw Officer Foley in his vehicle as he passed, but saw no other cars in the vicinity of the robbery. Officer Foley talked to him on the

---

[1]This radio call was directed to all police units in the area.

radio about the "possible vehicle"[2] which Officer Pennington at that time saw, two or three blocks away, proceeding west on First Street.

Both police units followed the "possible vehicle," Officer Pennington's car in front. They increased their speed[3] and overtook the Pontiac about one mile from the gas station. When he got very close to the Pontiac, Officer Pennington turned on his red light.

A third officer, Officer Anderson of the Santa Ana Police Department, was patrolling in a police unit about one and one-half or two miles away, when he heard the call about the robbery from the police station and immediately started toward the intersection of First and Raitt Streets. He then heard the radio call of Officer Foley concerning the "possible vehicle" westbound on First Street. As he proceeded toward the scene, the police station continued to give information about the robbery as they obtained it over the telephone.[4] He testified at the preliminary hearing[5] that the information supplied by the police station included the description of the robber and the fact that he was wearing a "dark 'sporty-type' hat and a blue or light blue-gray jacket" and that a .38 revolver was used in the robbery. Officer Anderson passed the Pontiac just as it was stopping and observed Officer Pennington's red light on. Officer Anderson turned his vehicle and stopped it in front of the Pontiac with the passenger side of his vehicle toward the Pontiac. When he stopped his vehicle, Officer Anderson saw that defendant was a passenger in the Pontiac, which was being driven by another male Negro, later identified as Mr. Swan.

What occurred next is referred to as a "felony stop." Officer Anderson's vehicle was to the left front of the Pontiac. Officer Pennington's vehicle was behind the Pontiac, and Officer Foley's vehicle was behind Officer Pennington's. The officers got out of their vehicles and took defensive positions with guns drawn. The officers did not approach the Pontiac

---

[2]The Pontiac.

[3]Apparently the Pontiac was not exceeding the speed limit, because the officers testified that they did not observe any Vehicle Code violations.

[4]Officers Foley and Pennington apparently did not receive all of the transmissions from the police station for the reason that they were communicating with each other on a radio frequency known as "Channel 2," whereas the station was transmitting on a frequency known as "Channel 1."

[5]The motion to suppress under Penal Code, section 1538.5 was submitted on the testimony given at the preliminary hearing, a transcript of which is a part of the record on appeal. The issue of probable cause was not relitigated at the trial, and, in fact, the details of Sergeant Branham's report to the police station and the police station's communications with the officers was excluded at trial on the ground that, except for the issue of probable cause which was not to be relitigated, the details of such conversations constituted hearsay. This procedure was, of course, proper, but, obviously, it ncessitates our obtaining the facts concerning the issue of probable cause primarily from the transcript of the preliminary hearing.

immediately. First, Officer Foley, and then Officer Anderson called to the occupants of the Pontiac to get out of the vehicle. From this point on, Officer Anderson took charge of the situation. The driver of the Pontiac was instructed to stay where he was and raise his hands, and defendant was instructed to raise his hands, step around the vehicle and stand next to the driver. Both were instructed to turn and face the vehicles behind the Pontiac. No questions were asked of the suspects at this moment, nor was identification asked for. Officer Anderson immediately began a patdown search of defendant for weapons. He felt something like bullets in defendant's jacket pocket. By feel, he could tell that they were not large caliber bullets. He reached into the pocket and removed four or five rounds of .38 bullets and a watch. He continued his patdown search but found no gun. Officer Anderson testified that bullets can be set off by striking the primer cap with a sharp object and that he had fear for his personal safety.

At this point, Officer Anderson handcuffed defendant and told him that he was under arrest for suspicion of armed robbery. He then turned defendant over to Officer Pennington and requested Officer Pennington to search defendant. Officer Pennington did so and removed approximately $50 in United States currency and one roll of quarters from defendant's left front trouser pocket. Officer Anderson searched the Pontiac and found, in a pillow case located between the two front seats, a .38 chrome revolver and two rolls of quarters. The gun was identified at trial as like the one used in the robbery. The bullets found on defendant fit the revolver. Officer Anderson also found a hat which was like the one worn by the robber. Defendant was wearing a jacket like the one worn by the robber.

The station attendant testified that about 10 minutes after the robbery, the police brought defendant and the other occupant of the Pontiac to the gas station. They were handcuffed and in a marked police vehicle. The station attendant was asked by a policeman "which was the one that came in." The attendant at first could not identify either of the men. Upon his request, they got out of the police vehicle to enable Branham to take a better look at them. Then Branham identified defendant as the robber. Defendant was still wearing the blue-gray zipper jacket, but was not wearing the cap. Branham also identified defendant as the robber at the trial. No lineup was ever held, nor was Branham ever shown any photographs of defendant. Branham testified that the Pontiac which Swan and defendant were driving had been in the station about an hour before the robbery to get gasoline. He could not remember who was in the car at that time other than that it was driven by a black male.

## Search and Seizure

Proper analysis of the search and seizure problem requires a distinction between the initial stop of the Pontiac and patdown search of defendant for weapons and the subsequent arrest of defendant and the search of defendant and the vehicle incident to said arrest. (See *People* v. *One 1960 Cadillac Coupe,* 62 Cal.2d 92, 95 [41 Cal.Rptr. 290, 396 P.2d 706].)

■ It is well established that circumstances short of probable cause to make an arrest may justify an officer's stopping motorists for questioning, and, if the circumstances warrant it, the officer may in self-protection request a suspect to alight from an automobile and to submit to a superficial search for concealed weapons. (*People* v. *Mickelson,* 59 Cal.2d 448, 450-451 [30 Cal.Rptr. 18, 380 P.2d 658]; *People* v. *Heard,* 266 Cal.App.2d 747, 751 [72 Cal.Rptr. 374].) ■ Should the investigation then reveal probable cause to make an arrest, the officer may arrest the suspect and conduct a reasonable incidental search. (*People* v. *Mickelson, supra; People* v. *Heard, supra.*) ■ Such action by police officers does not constitute an arrest, but, rather a temporary detention for purposes of investigation. (*People* v. *Gibson,* 220 Cal.App.2d 15, 21 [33 Cal.Rptr. 775]; *People* v. *Lockwood,* 253 Cal.App.2d 75, 79-80 [61 Cal.Rptr. 131].) ■ If the reason for the stop is an articulate suspicion of a crime of violence, and the officer has reason to fear for his personal safety, he may immediately proceed to make a patdown search for weapons without asking any prior questions. (*People* v. *Heard, supra,* at pp. 753-754.) " 'There is no reason why an officer, rightfully but forcibly confronting a person suspected of a serious crime, *should have to ask one question and take the risk that the answer might be a bullet.*' " (*People* v. *Heard, supra,* 266 Cal.App.2d 747, 754; see also the officer's actions in *People* v. *Schader,* 62 Cal.2d 716, 721 [44 Cal.Rptr. 193, 401 P.2d 665].)

■ The validity of any particular temporary detention involves a determination of fact by the trial court, and, on appeal, the question is whether the determination by the trial court is supported by substantial evidence. (*People* v. *One 1960 Cadillac Coupe, supra,* 62 Cal.2d 92, 96; *People* v. *Manis,* 268 Cal.App.2d 653, 659-661 [74 Cal.Rptr. 423].) ■ Of course, there must exist some suspicious or unusual circumstance such as will reasonably cause the officer to conclude in the light of his experience that criminal activity is afoot. (*Terry* v. *Ohio,* 392 U.S. 1, 30 [20 L.Ed.2d 889, 911, 88 S.Ct. 1868, 1884]; *Hood* v. *Superior Court,* 220 Cal.App.2d 242, 245 [33 Cal.Rptr. 782].) The circumstances which will justify a temporary detention, however, are "bewilderingly diverse" (*People* v. *Manis, supra,* at p. 659), and, just as in the question of probable

cause to arrest, each case must be decided on its own facts using an objective standard, which has been stated to be whether the circumstances are such as to indicate to a reasonable man in the position of the officer that such a course is necessary to the proper discharge of his duties (*People* v. *One 1960 Cadillac Coupe, supra,* at pp. 95-96; *Lane* v. *Superior Court,* 271 Cal.App.2d 821, 824 [76 Cal.Rptr. 895]; *People* v. *Manis, supra,* at pp. 653-659).[6]

■ Applying these rules to the case at bench, there can be no question but that the initial stop of the vehicle and patdown search for weapons of defendant by the officers were lawful. The officers knew that an armed robbery had taken place only moments before. They commenced their pursuit of the suspect vehicle while the station attendant was still on the telephone making his report of the robbery to the police station and when the vehicle was only two to three blocks away from the scene of the crime. It was shortly after 3 a.m. The vehicle was the only vehicle seen in the vicinity at the time of and immediately following the commission of the robbery and was traveling away from the scene of the crime on one of the few through streets in the immediate vicinity, a likely escape route. While the police had no information that a vehicle was used in connection with the robbery, neither police officers nor the courts are required to blind themselves to the well-known fact that automobiles are " 'frequently a facility for the perpetration of crime and an aid in the escape of criminals'." (*People* v. *Schader, supra,* 62 Cal.2d 716, 724.) It is noteworthy that in *People* v. *Mickelson, supra,* 59 Cal.2d 448, the landmark California case on the subject, the stop of an automobile was found valid despite the fact that "[t]he officer had no information that the robber had an automobile or a confederate." (59 Cal.2d at p. 454 [30 Cal.Rptr. 18, 380 P.2d 658].)

Obviously, the officers knew that criminal activity was afoot. They had just received a radio report of the armed robbery. Defendant's presence in an automobile in the immediate vicinity, within minutes after its commission, traveling away from the scene of the crime on a likely escape route, coupled with the fact that the vehicle was the only one on the streets and that the hour was shortly after 3 a.m. were sufficient to indicate to a reasonable man in the position of the officers that investigation of the automobile and its occupants were necessary to the proper discharge of their duties in connection with the robbery. (Cf. *People* v. *Schader, supra,* 62 Cal.2d 716;

---

[6]Indeed, in *People* v. *One 1960 Cadillac Coupe, supra,* 62 Cal.2d 92, 95, our Supreme Court has analyzed problems such as this as calling for two determinations of probable cause:

(1)  Probable cause to stop and detain for questioning, and

(2)  Probable cause to arrest.

*People* v. *Mickelson, supra,* 59 Cal.2d 448; *People* v. *Heard, supra,* 266 Cal.App.2d 747; *People* v. *Gibson, supra,* 220 Cal.App.2d 15.)

■ Being apprised of the fact of the robbery and the fact that the robber was armed with a revolver, Officer Anderson was fully justified in conducting a patdown for weapons without asking any questions. (*People* v. *Heard, supra,* at pp. 753-754.) Having felt the bullets, he was justified in removing them from defendant's pocket, either as potential weapons (*Terry* v. *Ohio, supra,* 392 U.S. 1, 29-30 [20 L.Ed.2d 889, 910-911, 88 S.Ct. 1868, 1884]) or as an instrumentality of the crime under investigation (see *People* v. *Hawxhurst,* 264 Cal.App.2d 398, 402-403 [70 Cal.Rptr. 253]). It is clear that the patdown search for weapons was just that, a preliminary search for weapons, for, had it been a more extensive search, Officer Anderson would surely have discovered the currency and roll of quarters subsequently found on defendant's person by Officer Pennington.

We are thus brought to the question whether Officer Anderson had probable cause to arrest defendant when he handcuffed him and placed him under arrest. ■ There is no exact formula for the determination of probable cause to arrest. Each case must be decided on its facts and circumstances. (*People* v. *Ingle,* 53 Cal.2d 407, 412 [2 Cal.Rptr. 14, 348 P.2d 577].) "Reasonable cause has been generally defined to be such a state of facts as would lead a man of ordinary care and prudence to believe and conscientiously entertain an honest and strong suspicion that the person is guilty of a crime." (*People* v. *Ingle, supra,* at pp. 412-413.) ■ The law looks only at the facts and circumstances presented to the officer at the time he is required to act. (*People* v. *Ingle, supra,* at p. 414; *People* v. *Fisher,* 184 Cal.App.2d 308, 313 [7 Cal.Rptr. 461].) The weight to be accorded the information upon which the officer acted is essentially a matter for the trial court's determination in the exercise of its sound discretion. (*People* v. *Fisher, supra,* at p. 312; *People* v. *Taylor,* 176 Cal.App.2d 46, 51 [1 Cal.Rptr. 86].) ■ An appellate court, in reviewing the propriety of an arrest without a warrant must determine whether the trial court's ruling is supported by any substantial evidence and must accept all evidence and all reasonable inferences therefrom in support of the trial court's determination. (*People* v. *Fisher, supra; People* v. *Wilcox,* 276 Cal. App.2d 414, 417 [81 Cal.Rptr. 60]; *People* v. *Shapiro,* 213 Cal.App.2d 618, 620 [28 Cal.Rptr. 907]; *Bergeron* v. *Superior Court,* 2 Cal.App.3d 433, 436 [82 Cal.Rptr. 711].)

The facts and circumstances known and apparent to Officer Anderson at the time of the stop and patdown have been fully set forth above. At the time defendant was handcuffed and arrested by Officer Anderson, the offi-

cer had considerable additional information. He had by that time seen defendant face to face and had a chance to compare his appearance with the description of the robber given over the radio. He had seen defendant's jacket and had an opportunity to compare its appearance with the description of the jacket the robber wore. Perhaps most importantly, he had found several .38 caliber bullets in defendant's possession. It will be remembered that Officer Anderson had received over the radio information that the robber had used a .38 caliber revolver in committing the robbery. Although Officer Anderson apparently did not testify that defendant's appearance matched the description of the robber, we presume in support of the trial court's decision that it did. (*People* v. *Sandoval*, 65 Cal.2d 303, 307 [54 Cal.Rptr. 123, 419 P.2d 187]; *People* v. *Hawxhurst, supra*, 264 Cal.App.2d 398, 403.) ▆▆▆ Defendant's similar appearance to the robber, his wearing a jacket matching the description of the jacket worn by the robber and his possession of the .38 caliber bullets moments after the robbery in which a .38 caliber revolver was used by the robber when added to his presence in the immediate vicinity of the robbery in the only automobile seen on the streets immediately after the robbery, traveling away from the scene of the crime on a likely escape route, constituted substantial evidence supporting the trial court's determination of probable cause. (Cf. *People* v. *Heard, supra*, 266 Cal.App.2d 747, 750-751; *People* v. *Schader, supra*, 62 Cal.2d 716, 722-724.)

▆▆▆ Defendant's arrest having been lawful, the additional search of his person incidental thereto by Officer Pennington and the search of the passenger area of the Pontiac conducted by Officer Anderson were lawful as incidental to the arrest. (*People* v. *Mickelson, supra*, 59 Cal.2d 448, 450-451; *People* v. *Burke*, 61 Cal.2d 575, 579-580 [39 Cal.Rptr. 531, 394 P.2d 67].) Furthermore, there was reasonable cause to believe that the vehicle itself was an instrumentality of the crime, a getaway car. (*People* v. *Brown*, 4 Cal.App.3d 382, 386 [84 Cal.Rptr. 390].)

### Field Identification—Right to Counsel

Defendant's contention that the in-the-field identification at a time when he was not represented by counsel constituted an infringement of his constitutional right to counsel at all stages of the proceedings is based, of course, upon *United States* v. *Wade*, 388 U.S. 218 [18 L.Ed.2d 1149, 87 S.Ct. 1926]; *Gilbert* v. *California*, 388 U.S. 263 [18 L.Ed.2d 1178, 87 S.Ct. 1951]; and *People* v. *Fowler*, 1 Cal.3d 335 [82 Cal.Rptr. 363, 461 P.2d 643]. These cases establish the right to counsel at a lineup identification. It has been consistently held, however, that an in-the-field identification taking place shortly after the commission of a serious crime at a time when the suspect is not represented by counsel does not constitute an infringement

of the right to counsel. (*People* v. *Colgain*, 276 Cal.App.2d 118, 125-127 [80 Cal.Rptr. 659]; *People* v. *Levine*, 276 Cal.App.2d 206, 208 [80 Cal.Rptr. 731] and cases there cited; see also *People* v. *Floyd*, 1 Cal.3d 694, 714-715 [83 Cal.Rptr. 608, 464 P.2d 64].) The rationale of these decisions is the great reliability of on-the-spot identification by the victim; the service to law enforcement, the public and the criminal suspect of knowing promptly whether the right person has been apprehended; and the practical impossibility of representation by counsel at an immediate in-the-field identification. (*People* v. *Colgain, supra; People* v. *Levine, supra.*) ■ In the case at bench, according to the testimony of the station attendant, the identification took place approximately 10 minutes after the robber had left the station, and for the reasons set forth in *People* v. *Colgain, supra,* pp. 125-127, the in-the-field identification did not violate defendant's right to counsel. (See also *People* v. *Fowler*, 1 Cal.3d 335, 344-345, fn. 16 [82 Cal.Rptr. 363, 461 P.2d 643].)

### *Field Identification—Due Process*

■ If a defendant's identification as the perpetrator of a crime is derived from a pretrial identification that, under all of the circumstances of the case, was so unnecessarily suggestive as to be conducive to irreparable mistaken identification, admission of that identification or a derived in-court identification may constitute a denial of due process of law. (*Stovall* v. *Denno*, 388 U.S. 293 [18 L.Ed.2d 1199, 87 S.Ct. 1967]; *People* v. *Caruso*, 68 Cal.2d 183 [65 Cal.Rptr. 336, 436 P.2d 336]; *People* v. *Irvin*, 264 Cal.App.2d 747, 758 [70 Cal.Rptr. 892].) It is apparently defendant's contention that the officers' returning him and Mr. Swan to the scene of the robbery in a marked police vehicle, handcuffed, and asking the station attendant "which was the one that came in" was unnecessarily suggestive of defendant's identification because it singled him out. (Cf. *People* v. *Caruso, supra.*) Of course, as indicated, defendant was not exhibited singly. This argument, moreover, ignores the fact that implicit in the in-the-field identification process is the singling out of the suspect. It is recognized, of course, that this inherent singling out constitutes an element of suggestiveness in the single subject confrontation. (*Stovall* v. *Denno, supra,* 388 U.S. 293, 302 [18 L.Ed.2d 1199, 1206, 87 S.Ct. 1967, 1972]; *People* v. *Colgain, supra,* 276 Cal.App.2d 118, 128-129 [80 Cal.Rptr. 659]; *People* v. *Irvin, supra,* at pp. 759-760.) The potential unfairness in such suggestiveness, however, is offset by the likelihood that a prompt identification within

a short time after the commission of the crime will be more accurate than a belated identification days or weeks later. ▮ Furthermore, because the problem is inherent in such confrontations, the choice is between prohibiting all in-the-field identifications or permitting them notwithstanding the element of suggestiveness. The choice involves a balancing of the interests of fairness to criminally accused persons and prompt, proper and efficient law enforcement, and the choice has properly been made to permit in-the-field identifications, because the immediate knowledge whether or not the correct person has been apprehended is of overrriding importance and service to law enforcement, the public and the criminal suspect himself. (*Stovall* v. *Denno, supra,* 388 U.S. 293, 302 [18 L.Ed.2d 1199, 1206, 87 S.Ct. 1967, 1972]; *People* v. *Floyd, supra,* 1 Cal.3d 694, 714; *People* v. *Colgain, supra,* 276 Cal.App.2d 118, 128-129; *People* v. *Irvin, supra,* 264 Cal.App.2d 747, 759-760.)

▮ Moreover, where the defendant claims that the pretrial identification was so unnecessarily suggestive as to deprive him of due process of law, he must show that it gave rise to a very substantial likelihood of irreparable misidentification. (*Simmons* v. *United States,* 390 U.S. 377, 384 [19 L.Ed.2d 1247, 1253, 88 S.Ct. 967, 971].) ▮ There is no such substantial likelihood in this case. The circumstantial evidence that defendant was the robber is overwhelming. The vehicle in which he was traveling was observed in the immediate vicinity of the robbery, traveling away from the scene on a likely escape route, immediately after its commission. Found in the vehicle in which he was traveling was a .38 caliber revolver like that used by the robber, and he had in his pocket .38 caliber bullets fitting the revolver. He had a cap like the one worn by the robber. He was wearing a jacket like the one worn by the robber. A roll of quarters like one of those taken in the robbery was found in his pocket. A similar amount of currency as that taken in the robbery was found on his person. Two more rolls of quarters were found in the car in which he was traveling. All of this was within minutes after the robbery. Defendant has not been denied due process of law.

### Conviction of Kidnaping for Purpose of Robbery

This case was tried in April 1969 and judgment was pronounced in May 1969. ▮ Neither counsel nor the trial court, therefore, could know of the reinterpretation of Penal Code, section 209 by our Supreme Court in *People* v. *Daniels, supra,* 71 Cal.2d 1119, decided October 2, 1969. In *Daniels,* it was held that a kidnaping does not occur within the meaning of Penal Code, section 209 when "the movements of the victim

are merely incidental to the commission of the robbery and do not substantially increase the risk of harm over and above that necessarily present in the crime of robbery itself." (71 Cal.2d 1119, 1139 [80 Cal.Rptr. 897, 459 P.2d 225].) The rule of *Daniels* applies to all cases not final on the date of that decision. (*People* v. *Blair,* 2 Cal.App.3d 249, 257 [82 Cal.Rptr. 673].) The phrase "incidental to the commission of the robbery" appears to include movements of the victim incidental to and done for the purpose of facilitating the primary effort of the robber to escape. (*People* v. *Moore,* 4 Cal.App.3d 668, 671 [84 Cal.Rptr. 771]; see also *People* v. *Monk,* 56 Cal.2d 288, 295 [14 Cal.Rptr. 633, 363 P.2d 865]; but cf. *In re Chapman,* 43 Cal.2d 385, 389 [273 P.2d 817].)

■ The movement of the station attendant from the office to the rest room at the rear of the station occurred after the station attendant had handed over the money. It is obvious, that this movement was incidental to and solely for the purpose of facilitating the robber's escape. The Attorney General argues, however, that we should not hold as a matter of law that such movement out of the office and around to the rear of the station did not substantially increase the risk of harm over and above that necessarily present in the robbery itself.[7] (*People* v. *Daniels, supra,* 71 Cal.2d 1119, 1139.) Understandably, the facts concerning the possible increase in danger were not developed at the trial. The station attendant was moved outside of the station, however, and was threatened with having his head blown off if he stuck it out of the rest room door, and, on these facts, we agree with the Attorney General that we should not make this determination as a matter of law. (Cf. *People* v. *Chavez,* 4 Cal.App.3d 832, 838-839 [84 Cal.Rptr. 783]; and see *People* v. *Ramirez,* 2 Cal.App.3d 345, 355-356 [82 Cal.Rptr. 665].) Nevertheless, of course, the jury was not instructed on these matters. Under proper instructions it is reasonably probable that defendant would have had a more favorable result as to count II (*People* v. *Watson,* 46 Cal.2d 818, 836 [299 P.2d 243]), and his conviction of that offense cannot stand. (*People* v. *Chavez, supra,* at p. 839.)

With respect to count I, the judgment contains a recital that defendant was not charged with being or found to be armed with a deadly weapon within the meaning of Penal Code, sections 969c and 3024, but it does not provide that Penal Code, section 12022 is inapplicable nor include any finding as to whether defendant was personally armed with a deadly

---

[7]It should be noted that the *Daniels* problem in the case was raised not by defendant, whose brief was filed only seven days after the *Daniels* decision, but, commendably, by the Attorney General in discharge of his responsibilities to this court.

weapon within the meaning of Penal Code, section 1203 as required by *People* v. *Floyd,* 71 Cal.2d 879 [80 Cal.Rptr. 22, 457 P.2d 862].

The judgment of conviction on count II (kidnaping for the purpose of robbery) is reversed. The judgment on count I (robbery first degree) is reversed only as to the sentence and otherwise is affirmed. The cause is remanded for resentencing in accordance with *People* v. *Floyd, supra,* at which time the trial court may take such further action as it deems appropriate with respect to its order suspending sentence on the robbery conviction.

Kerrigan, Acting P. J., and Tamura, J., concurred.