[No. B021404. Second Dist., Div. Five. July 13, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT DALE COWGER, Defendant and Appellant.

1068

[Redacted content]

---

COUNSEL

David L. Tucker, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Susanne C. Wylie and Alfredo X. Jarrin, Deputy Attorneys General, for Plaintiff and Respondent.

---

OPINION

KENNARD, J.—A jury found defendant guilty of one count each of burglary (Pen. Code, § 459) and assault with intent to commit rape (Pen. Code, § 220). Found to be true was an allegation that defendant had suffered a prior conviction for burglary. Defendant, who was sentenced to state prison, appeals from the judgment of conviction. He contends (1) the victim's

in-field identification of him was impermissibly suggestive, and (2) an instruction on flight should not have been given. We affirm the judgment.

FACTS

*Prosecution's Case*

Sometime after midnight on August 5, 1985, 16-year-old Jamie T. returned to her Lakewood home after an outing to Disneyland. The only other person at the house at that time was Michael Williams, a family friend, who was asleep on a couch in the family room. Jamie went to sleep in her mother's bedroom. She was wearing long pants and a T-shirt. The lighting in the room was "fairly good." She was awakened by defendant's presence next to her in bed. Defendant was trying to pull off her shirt. A struggle ensued. When Jamie screamed for Williams, defendant hit her in the face. Uttering an obscenity, he told her: "You shouldn't have done that. Now I'm going to kill you." He grabbed her by the neck. When Jamie knocked over a night stand with a lamp on it, defendant said he was leaving. As Jamie started running towards the back door, defendant caught her and pushed her down on the bed. He tried pulling off her shirt and pants, without success. He hit her on the mouth and nose. Then he held her by the neck, went down on his knees, and told her to orally copulate him. She refused to do so.

While she kept fighting off defendant, Jamie managed to place a pillow against her face so defendant would not hit her there. Unable to see defendant, she felt him touch her breasts. When she kept pushing him away, he said he was leaving. She heard a sound like "crutches hitting." The sound was familiar because her mother had been using crutches a year ago.

Meanwhile, Williams had been awakened by "three muffled screams, yelling, "Mike, Mike, Mike."" As he opened his eyes, he saw defendant walk into the dining room and look directly at him from a distance of 15 to 20 feet. Defendant then turned around, and walked towards the front door with a pair of crutches under his right arm. Williams got up, grabbed a knife from the kitchen, and went to see Jamie. She was lying at the foot of the bed, with a pillow between her legs and a pillow on her face. Williams touched her on the shoulder and called out her name. She "flinched" for a second. Once she realized who it was, she got up, and embraced Williams. She was crying. She had scratch marks on her neck, a swollen lip, and blood on her nose. After wiping off the blood, Williams called the police.

At 4:30 a.m., Deputy Sheriff Ronald Spear received a radio call in his patrol vehicle about the incident. Within a minute, he and his partner

arrived at Jamie's home. Jamie was crying. Her lip was bleeding, her nose was swollen, and she had bruises around her throat. She related what had happened, and gave a description of defendant. In checking the area in front of the house, Deputy Spear saw footprints on the dew-covered lawn. There was only one set of footprints. On one side of the prints was a line 15 to 20 feet long and about 2 inches wide. The prints led from the front door to the concrete sidewalk, where there was a clear, wet shoeprint with small circles inside the print. The wetness of the print indicated the suspect was still in the area.

Deputy Spear followed the footprints across the street; over lawns and driveways; through front- and backyards; over a three-foot fence in a backyard; and through eight-foot tall oleander bushes until the prints resurfaced across the street from the bushes and disappeared in front of a house nearby. The prints were unusual because the distance between each print was only two feet.

It had taken the deputy about ten minutes to walk the distance of the footprints, which covered an area of two to three blocks. After noting the address of the house where the prints had disappeared, the deputy returned to Jamie's house. There he talked to Jamie's mother, who had just come home from work.

Jamie's mother told Deputy Spear that Jamie's description of her assailant matched that of defendant, whom she had met at a bar earlier that night before going to work. At the time, defendant was shooting pool. His crutches were against a nearby wall. A mutual friend introduced defendant to her as "Bobby." Following this information, Deputy Spear returned to defendant's house. His partner was with him.

Deputy Spear knocked on the front door. A woman came to the door. The deputy told her he was investigating a felony and wanted to talk to Bob. The woman opened the door, and said, "I will show you where his room is." She then took the deputies to a bedroom. Defendant was lying on a bed with his eyes closed. When Deputy Spear said, "Bob," defendant opened his eyes. The deputy identified himself, and said he wanted to discuss a matter. Defendant responded, "I've got nothing to hide." While talking to defendant, Deputy Spear noticed a pair of crutches against a wall. On the floor next to the bed were a pair of tennis shoes and a pair of blue jeans. The shoes were very wet and had grass on them. One of the shoes was lying on its side, and the deputy could see rubber markings on the bottom matching those he had seen earlier inside the footprints. The jeans had very wet cuffs, which had grass on them. Deputy Spear asked defendant to go outside so the victim could take a look at him. Defendant replied he would

comply. Deputy Spear's partner then picked up Jamie from her house and brought her to defendant's house. When defendant came out through the front door, Jamie started crying, saying: "That's him, that's him. That's the man who tried to rape me." At that point, defendant was arrested.

*Defense*

Defendant testified in his own behalf. He admitted having suffered a prior conviction for burglary. Around 2:30 a.m. on August 5, 1985, he was at his home when his friend Randy Fisher came and asked him to go for a walk. Defendant did so. He was using crutches. He did not know where they were going. When they were in front of Jamie's house, Fisher knocked on the door while defendant remained on the front lawn. Defendant did not know Jamie, but he knew her mother, whom he had met earlier that night at a bar. When there was no response to the knocking, both men returned to defendant's house.

Fisher testified for the defense. He decided to go to Jamie's house because her mother often gave parties there. He went there with defendant. They left when nobody came to the door. Fisher admitted having previously been convicted of armed robbery and assault with a deadly weapon on a police officer.

## DISCUSSION

### 1. *Single-person Showup*

Defendant contends Jamie's in-the-field identification of him was an unreasonably suggestive one-person showup and therefore should have been excluded by the trial court.

A single-person showup is not necessarily unfair; each case must be assessed in the light of the totality of the circumstances. (*Stovall* v. *Denno* (1967) 388 U.S. 293, 302 [18 L.Ed.2d 1199, 1206, 87 S.Ct. 1967]; *People* v. *Bisogni* (1971) 4 Cal.3d 582, 587 [94 Cal.Rptr. 164, 483 P.2d 780]; *People* v. *Nash* (1982) 129 Cal.App.3d 513, 517 [181 Cal.Rptr. 145].) The potential unfairness in singling out a suspect is offset by the likelihood that a prompt identification shortly after the commission of a crime will be more accurate than a belated identification days or weeks later. (*In re Richard W.* (1979) 91 Cal.App.3d 960, 970 [155 Cal.Rptr. 11]; *People* v. *Anthony* (1970) 7 Cal.App.3d 751, 764-765 [86 Cal.Rptr. 767].)

A prompt on-the-scene confrontation between a suspect and a witness enables the police to exclude from consideration innocent persons so a

search for the real perpetrator can continue while it is reasonably likely he is still in the immediate area. (*People* v. *Nash, supra,* 129 Cal.App.3d 513, 517.) Such knowledge is of overriding importance not only to the police and the public, but also to the suspect himself. (*People* v. *Rodriguez* (1987) 196 Cal.App.3d 1041, 1049 [242 Cal.Rptr. 386]; *People* v. *Anthony, supra,* 7 Cal.App.3d 751, 765.) An innocent person who has been apprehended should not have to wait for the assembly of a lineup and the summoning of counsel while the real culprit puts more time, and presumably distance, between himself and the focal point of the offense. (*People* v. *Floyd* (1970) 1 Cal.3d 694, 714 [83 Cal.Rptr. 608, 464 P.2d 64] (disapproved on another point in *People* v. *Wheeler* (1978) 22 Cal.3d 258, 287, fn. 36 [148 Cal.Rptr. 890, 583 P.2d 748]); *People* v. *Irvin* (1968) 264 Cal.App.2d 747, 760 [70 Cal.Rptr. 892].)

■ A defendant who claims an unnecessarily suggestive pretrial identification bears the burden of showing it gave rise to "a very substantial likelihood of irreparable misidentification." (*Simmons* v. *United States* (1968) 390 U.S. 377, 384 [19 L.Ed.2d 1247, 1253, 88 S.Ct. 967]; *In re Richard W., supra,* 91 Cal.App.3d 960, 970.)

In determining the fairness of a single-person showup, the following factors are to be considered: (1) The opportunity of the witness to observe the suspect at the time of the crime, (2) the witness's degree of attention, (3) the accuracy of the witness's description of the suspect, (4) the certainty shown by the witness at the confrontation, and (5) the length of time between the crime and the confrontation. (*Neil* v. *Biggers* (1972) 409 U.S. 188, 199 [34 L.Ed.2d 401, 411, 93 S.Ct. 375]; *People* v. *Nash, supra,* 129 Cal.App.3d 513, 517.) All of these factors were present here.

■ Jamie had ample time to observe defendant closely, first when she was awakened by his presence in her bed, and then in the ensuing struggle, during which he beat her face. Her degree of attention was high: she kept fighting off defendant, who was trying to remove her clothes. She described defendant with such accuracy that her mother immediately recognized him as the person she had met in a bar earlier that night. At the on-the-scene confrontation, Jamie identified defendant instantaneously. Finally, the identification was prompt; it occurred within two hours after the crime.

There was no substantial likelihood of irreparable misidentification. Apart from Jamie's prompt identification of him, defendant was identified by Michael Williams. The latter was lying on a couch in the family room of Jamie's house when he saw defendant look directly at him from a distance of about 15 feet. Additionally, the police traced defendant's unique shoeprints from the front of Jamie's house to defendant's house.

Based on the totality of circumstances in this case, the single-person showup did not violate defendant's right to due process. Therefore, the victim's identification testimony was properly admitted at the trial. (*People* v. *Nash, supra,* 129 Cal.App.3d 513, 518-519.)

## 2. *Flight Instruction*

Penal Code section 1127c mandates an instruction on flight when evidence of a defendant's flight is relied on as tending to show guilt.[1] Flight is relevant because it may show consciousness of guilt. As the state Supreme Court said in *People* v. *Flannelly* (1900) 128 Cal. 83, 87 [60 P. 670], "it is more probable a guilty man will flee from the scene of crime than an innocent one." The principle of the relevance of flight is firmly grounded in this state's decisional law dating back as far as 1873. (*People* v. *Stanley* (1873) 47 Cal. 113, 118; *People* v. *Wong Ah Ngow* (1880) 54 Cal. 151, 153; *People* v. *Giancoli* (1888) 74 Cal. 642, 644 [16 P. 510]; *People* v. *Flannelly, supra*; *People* v. *Hall* (1926) 199 Cal. 451, 460 [249 P. 859]; *People* v. *Murguia* (1936) 6 Cal.2d 190, 192 [57 P.2d 115].) ■ Of course, when there is no evidence of flight, an instruction thereon may not be given. (*People* v. *Clem* (1980) 104 Cal.App.3d 337, 344 [163 Cal.Rptr. 553]; *People* v. *Watson* (1977) 75 Cal.App.3d 384, 403 [142 Cal.Rptr. 134].)

Here, the People requested the following jury instruction on flight (CAL-JIC No. 2.52): "The flight of a person immediately after the commission of a crime, or after he is accused of a crime, is not sufficient in itself to establish his guilt, but is a fact which, if proved, may be considered by you in the light of all other proved facts in deciding the question of his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine."[2] Over defendant's objection, the trial court gave the instruction, based on the court's finding there was substantial evidence of flight to support the giving of the instruction.

■ Defendant contends the instruction should not have been given because, based on his alibi defense, his identity was in dispute. In support of

---

[1] Penal Code section 1127 provides: "In any criminal trial or proceeding where evidence of flight of a defendant is relied upon as tending to show guilt, the court shall instruct the jury substantially as follows: The flight of a person immediately after the commission of a crime, or after he is accused of a crime that has been committed, is not sufficient in itself to establish his guilt, but is a fact which, if proved, the jury may consider in deciding his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine. No further instruction on the subject of flight need be given."

[2] This language is substantially similar to that used in Penal Code section 1127c. As that statute indicates, and as the cases have held (e.g. *People* v. *Hill* (1967) 67 Cal.2d 105, 120 [60 Cal.Rptr. 234, 429 P.2d 586]), the giving of an instruction on flight in language which varies slightly from the statutory language is not error.

his contention, defendant cites a number of appellate decisions, including *People v. Anjell* (1979) 100 Cal.App.3d 189 [160 Cal.Rptr. 669], the leading case on this issue. The Attorney General concedes error, but argues it was harmless. For reasons we shall discuss below, we do not accept the concession of error.

In *Anjell,* the defendant and a companion were charged with two armed robberies. One involved a gas station attendant, the other an office worker at a bus depot. The defendant presented an alibi defense as to both crimes. In ruling that sufficient evidence supported the flight instruction set forth in CALJIC No. 2.52, the trial court in *Anjell* apparently relied on these three instances of conduct cited by the prosecutor: (1) the robbers' flight from the crime scene, (2) the defendant's statement to the victim in the second robbery that he wanted to leave town and go to Mexico, and (3) a defense witness's statement that the defendant's wife had told him she and the defendant were moving out of the area. (*People v. Anjell, supra,* 100 Cal.App.3d 189, 201.)

On appeal, the *Anjell* court held the flight instruction should not have been given. The court found the statement about moving from the area to be an inadmissible hearsay statement attributed to the defendant's wife. The statement regarding going to Mexico was held to be "mere idle words." Noting there was no evidence the defendant had actually left, the court held both statements to be insufficient evidence to warrant an instruction on flight. (*Id.* at pp. 200-201.)

With respect to the statement that the robbers had fled from the crime scene, there was no discussion in *Anjell* of any facts on this issue. It would appear that had such evidence existed, it would have been set forth in the opinion. In our view, the mere representation by the prosecutor to the trial court that the robbers had fled was, standing alone, insufficient evidence of flight. In this regard, we note that in discussing the defendant's statement about leaving for Mexico the *Anjell* court noted that "statements alone" are insufficient to justify a flight instruction. (*Id.* at p. 201.) Thus the *Anjell* court could have held simply that the mere statement the robbers had fled was insufficient evidence to warrant a flight instruction, citing in support, for instance, *People v. Watson, supra,* 75 Cal.App.3d 384, 403. This, we believe, would have been a logical conclusion, especially because of the court's disposition of the other two statements on the ground of insufficiency of the evidence to warrant a flight instruction.[3]

---

[3] Recently, in *People v. Williams* (1988) 44 Cal.3d 1127 [245 Cal.Rptr. 635, 751 P.2d 901], the state Supreme Court upheld the giving of a modified version of CALJIC No. 2.52 (the flight instruction) with regard to the defendant's attempt to escape, based on substantial evidence in support of the instruction. In doing so, the state high court distinguished *Anjell.* The

Instead, the *Anjell* court resolved the issue with this sweeping statement: "The fact that the perpetrators fled the scene of the crime cannot warrant an instruction on flight where identity is a contested issue." (*People* v. *Anjell, supra,* 100 Cal.App.3d 189, 199.) In arriving at this conclusion, the *Anjell* court relied on *People* v. *Mora* (1956) 139 Cal.App.2d 266 [293 P.2d 522]. We believe the reliance to be misplaced.

Defendant Mora was one of three defendants accused of robbing an Oakland store and fleeing from the crime scene. All three defendants admitted being together on the day of the robbery but denied complicity, claiming alibi. No evidence of flight was presented as to Mora. With respect to the other two defendants, they testified that the day after the robbery they did not return to their Oakland home but instead went to Richmond to spend the night after learning the police had been inquiring about some traffic tickets one of them had received. The trial court gave an instruction on flight in the language of Penal Code section 1127c. On appeal, all three defendants challenged the propriety of the instruction. The reviewing court concluded that as to the two defendants who had gone to Richmond there was substantial evidence of flight, thus justifying the flight instruction. However, with respect to defendant Mora, the court held the instruction to be improper because of the absence of evidence of flight.[4] The court never even hinted the instruction should not be given when identity is in issue. (*People* v. *Mora, supra,* 139 Cal.App.2d 266, 269-274.) Yet this was the proposition for which *Mora* was cited in *Anjell*.

*Anjell's* conclusion is being followed by a growing line of appellate decisions which do not question its propriety but generally hold the giving of the flight instruction to be harmless error. (See e.g. *People* v. *Jackson* (1986) 187 Cal.App.3d 499, 511 [231 Cal.Rptr. 889]; *People* v. *Malgren* (1983) 139 Cal.App.3d 234, 242 [188 Cal.Rptr. 569]; *People* v. *Salazar* (1982) 108 Cal.App.3d 992, 998 [167 Cal.Rptr. 38].) We also note that the pocket part of volume 1 of California Jury Instructions, Criminal, has this comment to CALJIC No. 2.52, the instruction on flight: "It is error to give this instruction when the identity of the perpetrator who fled is in question." The case cited in support is *People* v. *Malgren, supra,* which in turn cites *Anjell*.

Since the court in *Mora* upheld the giving of the flight instruction as to two of the defendants because of substantial evidence to support it, even

---

*Williams* court noted that in *Anjell* the statements about the defendant's departure for Mexico and the flight of the robbers constituted insufficient evidence to support a flight instruction. (*Id*. at pp. 1144-1145.)

[4] As in *Anjell, supra,* 100 Cal.App.3d 189, the court in *Mora* referred in its summary of the facts to the flight of the robbers but mentioned no facts to support its conclusion of flight. The court noted simply that "the three robbers had fled." (*People* v. *Mora, supra,* 139 Cal.App.2d 266, 269.) Earlier, in discussing *Anjell,* we noted that a mere statement the perpetrator fled is, standing alone, insufficient evidence of flight.

though the defendants had placed their identity in issue by claiming alibi, it did nothing more than reiterate the long-established rule in this state that a flight instruction is proper when there is substantial evidence of flight, regardless of whether the perpetrator's identity is in issue. (See e.g. *People* v. *Davis* (1957) 48 Cal.2d 241, 247, 251 [309 P.2d 1]; *People* v. *Waller* (1939) 14 Cal.2d 693, 702 [96 P.2d 344]; *People* v. *Caudillo* (1980) 101 Cal.App.3d 122, 124-125 [161 Cal.Rptr. 293]; *People* v. *Vasquez* (1979) 94 Cal.App.3d 42, 44 [156 Cal.Rptr. 235]; *People* v. *Leach* (1949) 90 Cal.App.2d 667, 670, 671 [203 P.2d 544]; *People* v. *Gryszkiewicz* (1948) 88 Cal.App.2d 230, 233, 235 [198 P.2d 585].) *Anjell* made no attempt to distinguish any of these cases, or decisions similar to these cases. The holdings in these cases would be obliterated if we were to blindly apply *Anjell* conclusion that a flight instruction may not be given when identity is in issue.

A careful analysis of *Anjell* leads us to believe that its sweeping statement on the issue of flight is unnecessary and overbroad dictum. There is no indication in *Anjell* that at his trial the defendant had raised the issue of the propriety of the flight instruction based on disputed identity, or that he did so on appeal. In discussing the flight instruction, the reviewing court in *Anjell* mentioned merely that the defendant had voiced an "objection" to the instruction, and that the trial court had found there was "sufficient evidence to support the instruction." (*People* v. *Anjell, supra,* 100 Cal.App.3d 189, 199.) It would thus appear that, as to this instruction, sufficiency of the evidence to support the instruction was the only ground presented on appeal. Based on these factors and the fact that, as we explained earlier, the *Anjell* court could have properly disposed of the issue on the ground of insufficiency of the evidence to warrant an instruction on flight, we consider *Anjell's* conclusion that such an instruction may not be given whenever identity of the perpetrator is in dispute to be unnecessary to its decision and therefore dictum, which we decline to follow. (See 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 783, pp. 753-755, and cases cited therein.)

■ We now determine whether, as the trial court found, there was substantial evidence supporting the flight instruction in this case. Defendant's footprints led from the victim's house to defendant's house. The prints, however, did not indicate a direct route. Instead they went across lawns, through front- and backyards, over a three-foot fence in a backyard, and through eight-foot tall oleander bushes. The circuitous route taken by defendant was indicative of "an attempt to avoid contact with the police." (*People* v. *Reza* (1981) 121 Cal.App.3d 129, 133 [175 Cal.Rptr. 126].) Defendant had difficulty in walking, and needed crutches to get around. It would appear that a person with limited movability would take the shortest route possible to minimize any physical discomfort. We conclude the evi-

dence was sufficient to support the giving of the instruction. (*People* v. *Reza, supra.*)

### DISPOSITION

The judgment of conviction is affirmed.

Ashby, Acting P. J., and Boren, J., concurred.