Filed 10/20/14  P. v. White CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B249716 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA081001) |
| v. | |
| DERRICK WHITE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Lisa B. Lench, Judge.  Reversed and remanded with directions.

Jean Ballantine, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Yun K. Lee and Stephanie C. Santoro, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Derrick White appeals from the judgment entered upon his convictions of second degree robbery (Pen. Code, § 211) and possession of a firearm by a felon (Pen. Code, § 12021, subd. (a)(l).)[1] Appellant contends that the trial court committed a number of reversible errors, including that the court erred: (1) when it denied appellant's motion pursuant to *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*) for an *in camera* review of police officers' records; (2) when it denied a motion to suppress the evidence of witnesses' identifications of appellant from a suggestive field show up; and (3) in sentencing appellant. As we shall explain, appellant's contentions related to his *Pitchess* motion and sentences have merit. Appellant met the low threshold required to warrant an *in camera* hearing on his motion for discovery of police records and he demonstrated that the court erred in sentencing him. Nonetheless, appellant failed to show that the witnesses' identifications were the result of an impermissibly suggestive show-up. Accordingly, we conditionally reverse the judgment and order a limited remand with respect to the *Pitchess* motion.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.     *Robbery of the Super Bargain Store*

On February 2, 2009, shortly before 7:30 p.m., a man, later identified as appellant, wearing a black jacket, black pants, black shoes, black gloves and a black hat entered the Super Bargain, a 99 Cents Store in Long Beach. Appellant asked John Melliza, the store manager, for help finding index cards. After assisting appellant find index cards, Melliza returned to his office in the store.

Hilda Cortez worked as a cashier in the store that evening. Appellant entered Cortez's line and placed a bag of chips on the counter next to the cash register. Cortez "got a good look at [appellant's] jacket" at the time. Appellant asked Cortez for assistance to locate flash cards. Cortez directed him to where he could find the cards. Appellant then returned to the register area and waited in line. When he reached the front

---

[1]     All references to statute are to the Penal Code unless otherwise indicated.

of the line, Cortez charged him for the items, and appellant handed her money. When she opened the cash register, appellant pulled a gun out of his pocket and pointed it at Cortez. He took the cash drawer out of the register and walked out of the store. Cortez informed Melliza the store had been robbed.[2]

### B.    The Pursuit

Melliza called 9-1-1 and walked out of the store in search of the robber. Melliza saw appellant quickly walking past a pizza store, holding the cash register drawer. Melliza followed him.

At the time, Mohammad Itani, a taxi driver, sat in his taxi in the parking lot of the Super Bargain store. Itani saw appellant carrying the cash register drawer while walking out of the parking lot. Itani also observed appellant pick up money that had fallen from the cash register drawer. Itani observed appellant as appellant walked in front of the taxi, approximately five feet away. According to Itani, appellant wore a hip-length black jacket and dark pants.

Melliza approached Itani and told him that the man with the cash register drawer had just robbed the store. Itani and Melliza followed appellant on foot. Itani and Melliza remained about 15 feet behind appellant. Appellant walked out of the parking lot in the direction of several apartments; as he walked money fell out of the register drawer that appellant carried. At one point it appeared that appellant was attempting to hide under a parked truck. However, appellant started walking again but stopped when he reached a dead end. He turned toward Itani and Melliza, pulled out a gun, and said, "Get out of here." He fired the gun once in the air above his head. Appellant was about 40 feet away from Itani and Melliza at the time. Before appellant discharged the gun, Itani saw a woman exit from a parked red car nearby. Itani saw appellant approach and get into the

---

[2]    Video surveillance from the store showed the transaction and the robbery from different angles. The videos were played for the jury during appellant's trial.

red car; Itani saw the car drive southbound on Atlantic Avenue. Melliza told the 9-1-1 operator that the robber got into a red car.

### C. The Police Pursuit

Long Beach Police Officer Nicholas Kent responded to the 9-1-1 call. The 9-1-1 call described the suspect as an African-American man in his 30's wearing a black jacket. The getaway car was described as a red four-door vehicle, with a female passenger, traveling southbound on Atlantic Avenue.

Minutes after the 9-1-1 dispatch, Officer Kent saw a vehicle matching the description with a female driver. Officer Kent followed the red vehicle as it turned into a residential area where it ran two stop signs. A helicopter with a spotlight as well as two other patrol cars joined the pursuit of the red vehicle.

During the pursuit, a black cash register drawer and a glove were thrown out the front passenger window of the red vehicle. The red vehicle continued into a residential neighborhood, ran several stop signs, and made several turns. At several points during the pursuit, money was thrown from the front passenger window. Officer Kent testified that he was never more than three car lengths from the red vehicle during the pursuit.

At one point during the chase, Rosalio Nuno, who lived at the intersection of Poppy and Walnut, saw a red vehicle followed by patrol cars and a helicopter pass by his house. As the red vehicle passed, Nuno saw a gun thrown out of the car. The gun was loaded and the safety clip was off.

The red vehicle entered a Food 4 Less parking lot and parked. The police instructed the passenger and driver via loudspeaker to exit the vehicle. A woman exited from the driver seat. Police placed handcuffs on her and placed her in a patrol car.

The police ordered appellant out of the car. Appellant wore one yellow boot and one black tennis shoe. Appellant was ordered to lie down on the parking lot ground. He was placed in handcuffs, and searched. Appellant's wallet contained a large amount of cash. Money was also found in various places in the red vehicle (e.g., between the seats

4

and in the glove box).  The police found a yellow work boot, a black jacket, and a black tennis shoe in the vehicle.[3]

D.      *Witnesses' Identifications of Appellant at the Field Show-up in the Food 4 Less Parking Lot*

**Melliza's Identification.**  A Long Beach police officer drove Melliza to the Food 4 Less parking lot for a field show-up.  En route, the officer told Melliza that he was taking him to identify "the suspect" and that person in custody may or may not be the robber.  Melliza read and signed the field show-up admonition form.[4]  Melliza saw a red vehicle approximately 25 feet from several parked patrol cars.  The parking lot was illuminated by the parking lot lights and patrol car lights.  A spot 20 feet from the patrol car was illuminated with a patrol car spotlight.  Appellant, was brought to the lit area; he was the only African-American among those present.  Appellant wore a white shirt, blue jeans, and yellow work boots.  Appellant was in handcuffs, and the officers stood beside him.  Melliza identified appellant as the person who fired his gun in the air.

Two months after the robbery, at the preliminary hearing, Melliza identified appellant as the robber.  During trial, Melliza identified appellant in court as the suspect from the field show up.  Melliza was 100 percent sure of his field show-up identification, his preliminary hearing identification, and in-court trial identification.

**Itani's Identification.**  An officer interviewed Itani for 15 minutes at the Super Bargain store shortly after the 9-1-1 call.  About an hour after the robbery, Itani was transported to the Food 4 Less parking lot.  The officer told Itani that the police had a suspect in custody and wanted him to determine if the person in custody was the robber

---

[3]     The yellow work boot and black tennis shoe appellant wore when he got out of the car matched the yellow boot and black shoe found in the car.

[4]     The admonition advises the witness that the person detained for viewing may or may not be the person who committed the crime and that the fact that the person is detained and may be handcuffed should not be an influencing factor.

or not. Itani was read the field show-up admonition, and Itani signed the field show-up admonition form. Appellant was 10 to 15 feet away from Itani, illuminated by the parking lot lights and the spotlight from a patrol car. He was handcuffed.

Itani identified appellant as the man who fired the gun but said that he was missing a black jacket. Itani also stated that appellant's shirt and pants were not the same as what the robber had worn earlier. A police officer took a black leather jacket out of the red vehicle and put it on appellant. Itani again identified appellant. Itani believed the red car in the Food 4 Less parking lot was the same red car he observed that evening. Itani identified appellant in court as the suspect from the field show-up.

A second suspect, a woman, was also shown to Itani during the show-up. Itani identified the woman as the woman he saw standing outside the red car earlier when the gun was fired. She had changed pants, but Itani recognized the sunglasses on her head. Itani identified her immediately.

**Cortez's Identification.** The police interviewed Cortez about 30 minutes after the robbery, Cortez was also transported to the Food 4 Less parking lot. The police read the field show-up admonition to Cortez and Cortez recalled signing the card. Cortez sat in a patrol car, and appellant stood 25 feet away, handcuffed with two police officers standing next to him. Cortez identified appellant as the robber. It "took [her] a while" because Cortez said appellant was wearing different clothes. Cortez also said that appellant was not wearing the leather jacket and beanie he had been wearing during the robbery. However, Cortez said she "recognized his face." When the police were advised of Cortez's statement, an officer found a black leather jacket in the red vehicle and placed it on appellant. Cortez identified the jacket as the one worn by the person who robbed the store. Cortez also identified the gun (recovered during the chase) as the gun used during the robbery. Cortez identified appellant in court as the man who robbed the store that evening.[5]

---

[5] During the trial appellant presented testimony from an investigator, Gary Cooper, that he had retained to assist him in preparing for his defense. The investigator

6

Appellant was charged with second-degree robbery, criminal threats, and possession of a firearm by a felon. It was also alleged that appellant used and discharged a firearm and that appellant had four prior "strikes," five prior serious felonies, and five prior prison terms.

Prior to trial, appellant filed a motion pursuant to *Pitchess* to obtain discovery of police personnel records for the 30 officers involved in his arrest and the investigation involving complaints of violence, excessive force, racial, gender and ethnic bias, coercion, and misconduct amounting to moral turpitude (including planting evidence, fabrication of reports, charges, false arrest, destruction of evidence or fabricating probable cause, concealing information, improperly influencing witnesses and perjury). Counsel's declaration in support of the motion stated that police officers used excessive force in removing appellant from the vehicle, assaulted him causing serious injury, and then covered up their use of excessive force by falsely arresting appellant based on fabricated evidence and testimony. The trial court denied the motion without prejudice.

Appellant filed a second *Pitchess* motion limited to 17 officers, asserting that appellant did not commit the robbery or possess a gun that evening, that the police stopped the wrong red car, that appellant's clothing description did not match that given on the police radio call, and that the police fabricated evidence and testimony to cover up their use of excessive force in arresting appellant. The court denied the second *Pitchess* motion. The court refused to conduct an *in camera* hearing, concluding that in view of the other evidence it did not present a plausible scenario of police misconduct.

---

interviewed Cortez two years after the robbery. Cooper testified that Cortez told him that she could not recall anything about the robber's face. According to Cooper, Cortez stated that she never told the police that she could identify the suspect in the Food 4 Less parking lot and never identified appellant as the robber. Cortez stated that she tried to identify the suspect at the field show-up based on his clothing. According to Cooper, Cortez told the police she was not sure if the suspect in custody was the robber because he was wearing different clothes and could not identify the jacket and a gun the police showed her. Cortez told Cooper that she did not recall being read a field show-up admonition or signing the form. When asked about her interview with Cooper at trial, Cortez denied that she told Cooper that she did not recognize appellant and did not recall telling Cooper that she failed to identify appellant during the show-up.

7

Appellant also filed a motion to suppress the field show-up identifications of Cortez, Melliza and Itani, and Melliza's in-court identification of appellant at the preliminary hearing on the grounds that the field show-up was unreasonably suggestive and conducive to irreparable mistaken identification. He also argued that any subsequent in-court identification was tainted by the field show-up. The trial court disagreed and denied the motion.

The jury found appellant guilty of second degree robbery (count 1) and felon in possession of a firearm (count 4). The jury also found the firearm use and discharge allegations to be true. Appellant admitted his prior convictions. The trial court sentenced appellant to prison for 95 years to life calculated as follows: as to count 1, 25 years to life, plus 20 years (§ 12022.53, subd. (c)); and as to count 4, a consecutive 25 years to life. The trial court imposed an additional consecutive 25 years for the five prior serious felonies (§ 667, subd. (a)). Appellant was awarded 1,844 days total presentence credits, consisting of 1,604 days of actual custody and 240 days of conduct credit. Appellant was also ordered to pay a $280 restitution fine (§ 1202.4, subd. (b)), a $40 court security fee (§ 1465.8), and a $30 criminal conviction assessment (Gov. Code, § 70373); a $280 parole revocation fine (§ 1202.45) was imposed and stayed.

Appellant filed this appeal.

## *DISCUSSION*

### I.    *The Trial Court Erred in Denying Appellant's Second <u>Pitchess</u> Motion.*

Appellant contends that the trial court erred when it failed to grant his motion to conduct an *in camera* review of police personnel records.

#### A.    *Factual Background of the <u>Pitchess</u> Proceedings*

Appellant filed a motion for pretrial discovery pursuant to *Pitchess* requesting the peace officer personnel records for 30 Long Beach police officers, including complaints pertaining to violence, excessive force, racial or gender bias, coercion, and misconduct amounting to moral turpitude (including planting evidence, fabrication of reports or probable cause, and perjury). Appellant's counsel's declaration in support of the motion stated that Long Beach police officers used excessive force in removing appellant from

8

the vehicle, assaulted him, and covered up their use of force by arresting appellant based on fabricated evidence and testimony. Counsel claimed that the materials sought would be relevant to the defense's case because past instances of false arrests or fabrication of charges and evidence would establish the officers acted in this case in conformity with past habits. It would also be relevant to the officers' character and for purposes of impeachment.

The City of Long Beach filed a written opposition to the motion, arguing, among other grounds, that the motion: was overbroad because it requested discovery as to some officers who were not actively involved in the arrest and field show-up; failed to provide a specific factual scenario establishing a plausible factual foundation as to the misconduct alleged; and improperly requested documents regarding excessive force.

At the hearing, appellant's counsel argued that the documentation in the form of the radio call and the police report showed that appellant was never the driver of the red vehicle and that the officers lost sight of the red vehicle at some point and were possibly following two red vehicles. Counsel argued the motion set forth a plausible scenario— namely that the police officers fabricated evidence and falsely arrested appellant to cover up their mistakes.

The trial court characterized appellant's motion as a "fishing expedition." The trial court denied the *Pitchess* motion, without prejudice, because it failed to satisfy the standard under *People v. Warrick* (2005) 35 Cal.4th 1011 (*Warrick*) by stating a plausible scenario as to officer misconduct as to each officer alleged.

Subsequently, appellant filed a second *Pitchess* motion, which requested the same materials but limited to 17 Long Beach police officers. Appellant's counsel's declaration in support of the renewed motion was similar to the declaration submitted in support of the first *Pitchess* motion. In addition, the declaration described the circumstances of the show-up. Counsel asserted that appellant did not commit the robbery or possess a gun, that the police stopped the wrong red car, that appellant's clothing did not match the description of the robber as relayed on the police radio call, and that the police fabricated evidence and testimony to cover up their use of excessive force in arresting appellant.

9

Appellant submitted the police inmate property receipt, which did not list yellow work boots, though the police report indicated that appellant wore a yellow work boot at the time of his arrest. Appellant also presented a form from a gunshot residue test in which the criminalist noted appellant's hands were dirty, which appellant argued showed that he was pushed onto the ground during the arrest.

At the hearing, appellant's counsel stated that although the second motion was similar to the first motion, the additional evidence submitted showed appellant had dirty hands from being pushed into the dirt during his arrest. Counsel maintained that she had presented a plausible scenario (i.e., the police stopped the wrong red car) to meet the *Warrick* standard.

The trial court stated that it "looked carefully" at both *Pitchess* motions, as well as the attached documentation. The court noted that three independent third-party witnesses identified appellant as the robber. Accordingly, the trial court stated that it did not believe there was any basis for officer misconduct. As to the discovery regarding excessive force, the court found no connection between the excessive force allegation and the three counts charged against appellant, and also found that the force was not excessive under the circumstances. The trial court denied the *Pitchess* motion.[6]

### B. Relevant Legal Principles

Although police officer personnel records are generally confidential, a criminal defendant is entitled to discover the content of such records if the information contained in the records is relevant to his ability to obtain a fair trial or to defend against pending charges. (*Pitchess v. Superior Court, supra,* 11 Cal.3d at pp. 536-538.) The process by

---

[6] At a later hearing, defense counsel attempted to file a third *Pitchess* motion, arguing that appellant could further narrow down the officers involved based on his recent recollection of the specific officers who had assaulted him during the arrest. The trial court noted that once a *Pitchess* motion has been denied, the defense is not permitted to file another *Pitchess* motion unless there is new information. The trial court concluded that there was no new evidence that would permit appellant to file a third *Pitchess* motion. Before this court, appellant does not argue that the trial court erred in denying him the opportunity to file a third *Pitchess* motion.

which a criminal defendant may discover personnel records is codified in Evidence Code sections 1043 to 1045. Initially, the defendant must submit a motion accompanied by an affidavit or declaration "showing good cause for the discovery or disclosure sought" and "setting forth the materiality thereof to the subject matter involved in the pending litigation." (Evid. Code, § 1043, subd. (b)(3).) "To show good cause as required by [Evidence Code] section 1043, [the] declaration in support of a *Pitchess* motion must propose a defense or defenses to the pending charges" and "articulate how the discovery sought may lead to relevant evidence or may itself be admissible direct or impeachment evidence [citations] that would support those proposed defenses." (*Warrick v. Superior Court, supra,* 35 Cal.4th at p. 1024.) The declaration "must also describe a factual scenario supporting the claimed officer misconduct." (*Ibid.*)

To determine whether the defendant has established good cause for in-chambers review of an officer's personnel records, the trial court makes the following inquiry: "Has the defense shown a logical connection between the charges and the proposed defense? Is the defense request for *Pitchess* discovery factually specific and tailored to support its claim of officer misconduct? Will the requested *Pitchess* discovery support the proposed defense, or is it likely to lead to information that would support the proposed defense? Under what theory would the requested information be admissible at trial? If defense counsel's affidavit in support of the *Pitchess* motion adequately responds to these questions, and states 'upon reasonable belief that the governmental agency identified has the records or information from the records' (Evid. Code § 1043, subd. (b)(3)), then the defendant has shown good cause for discovery and in-chambers review of potentially relevant personnel records of the police officer accused of misconduct against the defendant." (*Warrick, supra*, 35 Cal.4th at pp. 1026–1027.)

"[The] two-part showing of good cause is a 'relatively low threshold for discovery.'" (*Warrick*, *supra*, 35 Cal.4th at p. 1019, quoting *City of Santa Cruz v. Municipal Court* (1989) 49 Cal.3d 74, 83.) A defendant has met his or her burden if he or she "presents an assertion of specific police misconduct that is both internally consistent and supports the defense proposed to the charges" and the scenario described

11

"is one that might or could have occurred." (*Warrick, supra*, 35 Cal.4th at p. 1026.) A defendant's factual scenario must be accepted if it is *plausible*; the trial court is not to weigh or assess the evidence in order to determine whether the scenario presented is "reasonably probable" or "apparently credible." (*Id*. at pp. 1020, 1025-1026.) "The relatively relaxed standards for a showing of good cause . . . [ensures] the production for inspection of all potentially relevant documents. The *in camera* review procedure and disclosure guidelines . . . guarantee, in turn, a balancing of the officer's privacy interests against the defendant's need for disclosure." (*City of Santa Cruz v. Municipal Court*, *supra*, 49 Cal.3d at p. 84.)

Although the threshold for establishing entitlement to *Pitchess* discovery is low, it is the defendant's burden to meet that threshold. He or she must make an initial showing that supports the materiality of the information sought. (*People v. Hustead* (1999) 74 Cal.App.4th 410, 416.) The defendant is required to establish a "logical link between the defense proposed and the pending charge" and "also to articulate how the discovery being sought would support such a defense or how it would impeach the officer's version of events." (*Warrick, supra*, 35 Cal.4th at p. 1021.) In deciding a *Pitchess* motion, the trial court will generally have before it pertinent documents, such as the police report. (See *People v. Hill* (2005) 131 Cal.App.4th 1089, 1098-1099, disapproved in part on another ground in *People v. French* (2008) 43 Cal.4th 36.) But it is not the trial court's task to review the documents and develop a theory to support discovery of the requested information. Where the defendant fails to assert in the supporting declaration "'a specific factual scenario of officer misconduct that is plausible when read in light of the pertinent documents,'" the motion should be denied. (*People v. Hill, supra,* 131 Cal.App.4th at p. 1099.) "A motion for discovery of peace officer personnel records is addressed to the sound discretion of the trial court, reviewable for abuse." (*Alford v. Superior Court* (2003) 29 Cal.4th 1033, 1039.)

## C.     Appellant's Contentions

Before this court, appellant argues that the trial court erred in denying his *Pitchess* motion without an *in camera* hearing because he met the low threshold required by

*Pitchess* and *Warrick* by presenting a plausible factual scenario of officer misconduct, namely, that the police stopped the wrong car, used excessive force in arresting him, and then fabricated evidence and reports to cover up the use of force and false arrest. He also claims he demonstrated that the discovery sought was material to his defense.

Turning first to the issue of materiality of the discovery to the charges and the defense, under *Warrick*, appellant was required to show a logical connection between the defense proposed and the pending charge and "also to articulate how the discovery being sought would support such a defense or how it would impeach the officer's version of events." (*Warrick, supra*, 35 Cal.4th at p. 1021.) Here appellant's defense was that he did not commit the robbery, did not possess the firearm and that the police stopped and detained him by mistake.

In our view, appellant did not demonstrate the materiality to his defense of prior complaints of excessive force. Although such evidence might assist him proving that the police used unreasonable force in detaining him, none of the charges related to the use of police force or appellant's resistance of police force. Appellant does not claim that the police coerced him in any way. Furthermore, although police use of excessive force might motivate the police to engage in the other misconduct, it does not support his defense—that the police stopped the wrong car. Similarly, appellant failed to show how prior complaints of police improper bias (gender, racial or other bias) had any connection to this case. Appellant did not claim that he was detained because he was African-American; appellant was stopped based on the description of the car he was riding in at the time. Consequently, the court properly denied appellant's *Pitchess* motion seeking discovery of evidence related to bias and excessive force for lack of materiality.

This notwithstanding, we conclude that on this record appellant met the "low threshold" showing of good cause under *Warrick* for an *in camera* hearing with respect to other evidence he sought in his motion. In our view, evidence relating to prior complaints of police misconduct of falsifying evidence, destroying or concealing evidence and fabricating reports was directly material to appellant's claim of innocence (i.e., that the police stopped the wrong person and covered up the mistake by planting

13

evidence and fabricating charges against him). In addition, appellant supplied a plausible factual scenario for the claim of misconduct in light of the circumstances of the case. His claim was supported by evidence of the radio call and the police report which appellant argued suggested that he was not the driver of the red vehicle, that the officers lost sight of the red vehicle at some point, and that police were possibly following two red vehicles. This scenario is within the realm of possibility.

In reaching the opposite conclusion, the trial court cited the evidence of the eyewitnesses who identified appellant at the scene of the arrest, finding that appellant's scenario was not believable. In so doing, the court engaged in a credibility assessment of the evidence that is not permitted under *Warrick*. In this respect, the trial court's role in evaluation of a *Pitchess* motion is to determine whether the defendant's factual scenario might or could have occurred. (*Warrick, supra*, 35 Cal.4th at p. 1026.) The trial court is not to determine whether the scenario actually occurred, to resolve conflicts in the evidence, or to weigh or assess the evidence in order to determine whether the scenario presented is "reasonably probable" or "apparently credible." (*Id.* at pp. 1020, 1025-1026.) "*Warrick* permits courts to apply common sense in what is plausible, and to make determinations based on a reasonable and realistic assessment of the facts and allegations" (*People v. Thompson* (2006) 141 Cal.App.4th 1312, 1319); however, trial courts are not permitted to decide the persuasiveness of the defense in assessing a *Pitchess* motion.

As evidenced by his description of the circumstances of the eyewitness identifications in his counsel's declaration in support of the *Pitchess* motion, and by his subsequent motion to suppress the field identifications, in appellant's view, the field show-up was unfairly suggestive, the police intimidated the witnesses and/or told the witnesses to identify appellant. This characterization of the eyewitness evidence not only accounts for evidence directly connecting appellant to the crime, it is also consistent with appellant's scenario of police misconduct that he offered in this *Pitchess* motion.

In sum, we conclude appellant met his burden under *Warrick*. Appellant's assertion of police misconduct (i.e., the police falsified evidence, destroyed or concealed

14

evidence and/or fabricated reports to cover up the fact that they stopped the wrong person) was internally consistent, supported the proposed defense to the charges and described a plausible scenario. Accordingly we conclude that the trial court erred in denying appellant's second *Pitchess* motion.

The remedy for an erroneous *Pitchess* ruling is a limited remand to the trial court to conduct an *in camera* review of the personnel files of the officers.[7] If the trial court finds discoverable materials in the files, it should disclose them to the defense. Appellant would then have the burden of demonstrating to the trial court a reasonable probability of a different outcome had the evidence been disclosed. Should appellant fail to demonstrate prejudice under that standard, the judgment must be reinstated. (*People v. Gaines* (2009) 46 Cal.4th 172, 182.)

## II. The Single Person Show-up Did Not Violate Appellant's Constitutional Rights

Appellant also claims that the single person field show-up was suggestive and that the subsequent identification of appellant by Melliza at the preliminary hearing was tainted by the show-up. He contends on appeal that the trial court erred by denying the motion to suppress evidence of the identifications from the show-ups. The trial court did not err.

### A. Factual Background

Prior to trial, appellant filed a written motion to suppress the evidence of the identifications from the field show-ups as well as Melliza's in-court identification of appellant at the preliminary hearing on the grounds that the field show-up was unreasonably suggestive and that any subsequent in-court identification was tainted by

---

[7]  In appellant's second *Pitchess* motion he sought discovery of police personnel files of 17 police officers. Because we conclude appellant carried his burden under *Pitchess* only with respect to his claim that the police stopped the wrong car and arrested the wrong person and thereafter falsified evidence, destroyed or concealed evidence and/or fabricated reports to cover up their mistake, appellant is entitled to have the court conduct an *in camera* review limited to those officers who were directly involved in the police pursuit of the vehicle and of those officers at the scene of his arrest; and the court is required to order disclosure of only evidence in the files related to claims of falsifying evidence, destroying or concealing evidence and/or fabricating reports.

15

the field show-up.  Specifically, appellant complained that he was the only person shown to the witnesses, that he was the only African-American present, that he was surrounded by officers, that the red car was parked nearby and that he was illuminated by a spot light.  The trial court denied the motion, stating appellant had not been able to show that, under the totality of the circumstances, the show-ups gave rise to a substantial likelihood of misidentification.

### B.       Relevant Legal Principles and Analysis

A field show-up is "an informal confrontation involving only the police, the victim and the suspect."  (*People v. Rodriguez* (1987) 196 Cal.App.3d 1041, 1049.)  It is different from a lineup which "'is a relatively formalized procedure wherein a suspect, who is generally already in custody, is placed among a group of other persons whose general appearance resembles the suspect.  The result [of a lineup] is essentially a test of the reliability of the victim's identification.'"  (*Ibid.*)  On the other hand, the principal function of a field show-up is "'prompt determination of whether the correct person has been apprehended.  [Citation.]  Such knowledge is of overriding importance to law enforcement, the public and the criminal suspect himself.  [Citation.]  An in-the-field showup is not the equivalent of a lineup.  The two procedures serve different, though, related, functions, and involve different considerations for all concerned.'"  (*Ibid.,* citing *People v. Dampier* (1984) 159 Cal.App.3d 709, 712-713.)

A single person show-up is not inherently unfair.  (*Stovall v. Denno* (1967) 388 U.S. 293, 302; *People v. Bisogni* (1971) 4 Cal.3d 582; *People v. Bauer* (1969) 1 Cal.3d 368, 374 (cert. den., 400 U.S. 927); *People v. Burns* (1969) 270 Cal.App.2d 238, 246.)  The potential unfairness in singling out a suspect is offset by the likelihood that a prompt identification shortly after the commission of a crime will be more accurate than a belated identification days or weeks later.  (*People v. Cowger (*1988) 202 Cal.App.3d 1066, 1071; *In re Carlos M.* (1990) 220 Cal.App.3d 372, 387 ["[S]ingle-person show-ups for purposes of in-field identifications are encouraged, because the element of suggestiveness inherent in the procedure is offset by the reliability of an identification made while the events are fresh in the witness's mind, and because the interests of both the accused and

16

law enforcement are best served by an immediate determination as to whether the correct person has been apprehended."].)  A prompt on-the-scene confrontation between a suspect and a witness enables the police to exclude from consideration innocent persons so a search for the real perpetrator can continue while it is reasonably likely he or she is still in the immediate area.  (*People v. Cowger, supra,* 202 Cal.App.3d at pp. 1071-1072.)  "Such knowledge is of overriding importance not only to the police and the public, but also to the suspect himself.  [Citations.]  An innocent person who has been apprehended should not have to wait for the assembly of a lineup and the summoning of counsel while the real culprit puts more time, and presumably distance, between himself and the focal point of the offense.  [Citations.]"  (*Ibid*.)

However, a field show-up is not without constraints.  "Due process require(s) the exclusion of identification testimony only if the identification procedures used were unnecessarily suggestive and, if so, the resulting identification was also unreliable." (*People v. Yeoman* (2003) 31 Cal.4th 93, 123; see also *Manson v. Brathwaite* (1977) 432 U.S. 98, 106-114.)   If a pretrial identification procedure suggests the identity of the person to be identified in advance, then the procedure is unfair.  (*People v. Brandon* (1995) 32 Cal.App.4th 1033, 1052.)

"'The issue of constitutional reliability depends on (1) whether the identification procedure was unduly suggestive and unnecessary [citation]; and if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances, taking into account such factors as the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation [citation].  If, and only if, the answer to the first question is yes and the answer to the second is no, is the identification constitutionally unreliable.'  [Citation.]"  (*People v. Ochoa* (1998) 19 Cal.4th 353, 412; *People v. Thomas* (2012) 54 Cal.4th 908, 930.)  In other words, "[i]f we find that a challenged procedure is not impermissibly suggestive, our inquiry into the due process claim ends."  (*United States v. Bagley* (9th Cir. 1985) 772 F.2d 482, 492.)  The defendant

17

bears the burden of demonstrating the identification procedure was unreliable. (*Ibid*.) Unfairness must be proved as a "demonstrable reality," not just speculation. (*People v. Contreras* (1993) 17 Cal.App.4th 813, 819.)

Appellate courts review deferentially the trial court's findings of historical fact, especially those that turn on credibility determinations, but we independently review the trial court's ruling regarding whether, under those facts, a pretrial identification procedure was unduly suggestive. Only if the challenged identification procedure is unnecessarily suggestive is it necessary to determine the reliability of the resulting identification. (*People v. Thomas, supra,* 54 Cal.4th at p. 930; *People v. Alexander* (2010) 49 Cal.4th 846, 901-902; see also *People v. Cunningham* (2001) 25 Cal.4th 926, 989-990; *Simmons v. United States* (1968) 390 U.S. 377, 384 [even if a witness has been subjected to a suggestive pretrial identification procedure, "eyewitness identification at trial . . . will be set aside on that ground only if the [pretrial] identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification"].) In addition, the United States Supreme Court has clarified that the federal Constitution's due process clause is not implicated when the circumstances asserted as creating an improperly suggestive identification procedure were not arranged by law enforcement officers. (*Perry v. New Hampshire* (2012) 565 U.S.\_\_\_, \_\_\_, 132 S.Ct. 716, 721 [the application of the due process clause "turn[s] on the presence of state action and aim[s] to deter police from rigging identification procedures"].)

Here, appellant argues that the field show-up was suggestive because his hands were cuffed, he was shown near the red car, a spotlight illuminated him, he wore different clothes than those described as worn by the perpetrator, and that the officers placed a black jacket on him to assist in the identification. Appellant also complains that the officers made improper suggestive comments to the witnesses prior to the show-up, and that the identifications were cross-racial (that is, appellant was a different race than the witnesses).

Appellant has not demonstrated that the show-up was impermissibly suggestive. First there is no evidence to support appellant's claim that officers told the witnesses

before the show-up that they had caught the person who committed the robbery. All three witnesses were given the admonition that the person detained for viewing may or may not be the person who committed the crime. The admonition also apprised them that they should not be influenced by the fact that the person detained may be handcuffed. The witnesses signed the admonition cards. Both Itani and Melliza testified that the officers who transported them to the show-up told them the person in custody may or may not have committed the crime. In addition, other aspects of the show-up – including that appellant was handcuffed – do not automatically render the show-up suggestive. (*In re Carlos M., supra,* 220 Cal.App.3d at p. 386 [the mere presence of handcuffs on a detained suspect is not so unduly suggestive as to taint the identification].) Moreover, the car was parked 48 feet from appellant during the show-up in a parking lot of other parked cars.[8] The other features of the show-up—the fact that the police used spotlights, or that appellant stood next to a patrol car surrounded by officers—are the trappings of police activity that are inherent in nearly all field show-ups and are not necessarily suggestive or unfair in view of the circumstances of this case. Indeed, the show-up here was necessary in view of the public danger posed by the crime and the pursuit of the robber. The police were in close pursuit of a dangerous suspect who had just robbed a store, pointed a gun at the store cashier, and discharged a weapon out in the open. The situation called for quick and decisive police action. Under the circumstances the police needed to ascertain whether they had apprehended the right person as soon as possible, and if not, to immediately continue the pursuit to minimize the risk presented by an armed and fleeing robber.

*United States v. Pickar* (8th Cir. 2010) 616 F.3d 821 is instructive. In *Pickar*, the court upheld the trial court's decision to deny the defendant's motion to suppress his field show-up that occurred 45 minutes after a bank robbery when the defendant was

_____

[8]     The presence of the red car would have no bearing on Cortez who did not see the robber escaping in the car.

19

handcuffed, standing in front of a marked police vehicle, with a police officer shining a flashlight on the defendant's face and the victim stood 20 to 30 feet away inside the bank that was the subject of the defendant's robbery. (*Id.* at p. 828.) The court stated such a show-up was not unduly suggestive. The facts in this case are no more suggestive than those in *Pickar*. In short, appellant has not carried his burden to prove the field show-up was unduly suggestive.

In any event, even were we to conclude that the show-up was impermissibly suggestive appellant has not convinced us that the identifications were unreliable considering the totality of the circumstances. All three of the witnesses had a significant and sustained opportunity to view appellant from different vantage points at the time of the crime and as he was fleeing. Melliza had two opportunities to interact with appellant. He showed appellant where the index cards were in the store. Melliza pursued appellant from 15 feet to 40 feet behind for a number of blocks after appellant fled the scene. Melliza also saw appellant when appellant turned to face Melliza and Itani to discharge the weapon. Itani had similarly substantial opportunity to observe appellant. Itani observed appellant walk past his taxi within five feet, as appellant carried the cash register drawer. Itani watched as appellant stopped to pick up the money that had fallen to the ground. Itani joined Melliza's pursuit, and saw appellant fire the weapon. Itani saw the red car and the woman who accompanied appellant in the car. Cortez also had several opportunities to interact with appellant. He stood in her line at the cash register, he asked for assistance and she showed him where to find flash cards. He returned to her line, stood only a few away from Cortez when he pointed his weapon and demanded the cash register drawer. Appellant's encounters with all three of these witnesses spanned a number of minutes giving the witnesses ample time to observe and notice appellant.

Indeed, the witnesses were attuned to appellant's appearance and his conduct both before and after the crime. All three of the witnesses focused on appellant's appearance and clothing. They all noted that he was clad in black attire and wore a black hip-length jacket. Itani noticed appellant based on his unusual appearance and activity: walking through the parking lot quickly, carrying a cash register drawer, leaving a trail of money

20

in his wake. Itani and Melliza followed close behind appellant as he fled which required both witnesses to pay careful attention to appellant's movements. These circumstances required a high degree of attention of the witnesses.

As for the accuracy of the prior description, the witnesses described appellant's attire and all noted the black coat. Although when appellant was stopped he was wearing different attire than described from the robbery, the hip-length black jacket found in the red car matched the one described. In addition Itani described the red get-away car. Itani and the other witnesses described the cash register drawer and the gun both of which were observed by police and at least one other witness as they were thrown from the car during the police pursuit. Bullet shell casings found at the scene of the robber's escape match the gun thrown from the car. Itani also identified the female occupant of the red car as matching the person whom he saw within the red car as appellant made his escape.

The witnesses, especially Itani and Melliza expressed certainty as to their respective identifications of appellant as the robber. They were able to positively identify appellant as the perpetrator even before the officers put the black jacket on appellant's shoulders, and despite appellant's changed attire. Itani was also certain in his identification of the female suspect. Moreover, though it took a while for Cortez to positively identify appellant as the robber during the field show-up, she confirmed the identification after the officers placed a black jacket found in the red car on appellant.[9]

Finally, the show-up occurred within an hour after the robbery, allowing the witnesses to observe the suspect while the memory of the events was still fresh in their minds. Thus, based on the totality of the circumstances of this case, the single-person

_____

[9] At trial appellant presented testimony from his investigator raising questions about Cortez's credibility. That evidence, however, was not before the trial court at the time appellant brought the motion to suppress. Appellant did not renew his motion to suppress in light of the investigator's testimony nor did appellant object to the admission of Cortez's testimony about the identification at trial.

21

show-up did not violate appellant's right to due process.  Therefore, the witness identification testimony was properly admitted at trial.

## III.    *Appellant's challenges to his sentences*

Appellant claims that the court committed a number of sentencing errors.  First he claims that the court failed to recognize that it had discretion when it sentenced him to consecutive rather than concurrent sentences under section 667, subdivision (c).  In addition, appellant argues that the court improperly imposed a five-year sentencing enhancement under section 667, subdivision (a).  Finally, appellant claims the court erred when it imposed certain fees and fines.  We address these contentions in turn.

### A.    *The Imposition of Consecutive Sentences on Counts 1 and 4 Under Section 667, Subdivision (c)*

Appellant asserts the trial court committed sentencing error when it failed to recognize it had discretion under section 667, subdivision (c) to impose concurrent rather than consecutive sentences as to counts 1 and 4, and that the case must be remanded to allow the court to exercise its discretion.

At the sentencing hearing, the trial court declined to strike any of appellant's five prior convictions under *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497 in view of appellant's prior life of crime and record.  The court then proceeded to sentencing, stating "I don't have a whole lot of discretion here."  The court stated: "Looking at the circumstances in aggravation here, I note that the crime involved great bodily harm or threat of great bodily harm following and disclosing a high degree of cruelty or callousness.  I note that the victim was vulnerable.  I note that the defendant used a weapon.  The manner in which the crime was carried out indicates some planning.  And the defendant's prior convictions as an adult are numerous and of increasing seriousness.  The court has not identified any circumstances in mitigation, . . ."

The trial court then imposed the following sentence: "On count 1, the violation of Penal Code section 211, the court imposes, as required under the Penal Code, 25 years to life.  [¶]  On count 4, violation of Penal Code section 12021[, subdivision (a)], the court imposes, again statutorily required, 25 years to life.  [¶]  Regarding the special allegation

22

concerning the use of and discharge of the firearm, the court imposes 20 years consecutive to life." The abstract of judgment reflects that the sentences as to counts 1 and 4 are to run consecutively.

Section 667, subdivision (c)(6) (and section 1170.12, subdivision (a)(6)) provide: "If there is a current conviction for more than one felony count not committed on the same occasion, and not arising from the same set of operative facts, the court shall sentence the defendant consecutively on each count pursuant to subdivision (e)." (*People v. Hendrix* (1997) 16 Cal.4th 508, 512.) "By implication, consecutive sentences are not mandatory under subdivision (c)(6) if the multiple current felony convictions are 'committed on the same occasion' or 'aris[e] from the same set of operative facts.'" (*Id.* at pp. 512-513.) In addition, section 667, subdivision (c)(7), provides: "If there is a current conviction for more than one serious or violent felony as described in paragraph (6), the court shall impose the sentence for each conviction consecutive to the sentence for any other conviction for which the defendant may be consecutively sentenced in the manner prescribed by law." We concluded that section 667, subdivision (c)(7), "applies when there is more than one current serious or violent felony," and that the reference to "paragraph (6)" in subdivision (c)(7) is to subdivision (c)(6). (*People v. Hendrix, supra,* 16 Cal.4th at p. 513.) "So construed, 'more than one serious or violent felony as described in paragraph (6)' refers to multiple current convictions for serious or violent felonies 'not committed on the same occasion, and not arising from the same set of operative facts.' ([§ 667,] [s]ubd. (c)(6).) Thus, when a defendant is convicted of two or more current serious or violent felonies 'not committed on the same occasion, and not arising from the same set of operative facts,' not only must the court impose the sentences for these serious or violent offenses consecutive to each other, it must also impose these sentences 'consecutive to the sentence for any other conviction for which the defendant may be consecutively sentenced in the manner prescribed by law.' By implication, consecutive sentences are not mandated under subdivision (c)(7) if all of the serious or violent current felony convictions are 'committed on the same occasion' or 'aris[e] from the same set of operative facts.'" (*Ibid.,* see § 667, subd. (c)(7).)

23

"[A]n abuse of discretion occurs where the trial court was not 'aware of its discretion' . . . ."  (*People v. Carmony* (2004) 33 Cal.4th 367, 378.)

Here, as in *Hendrix*, the parties conceded that all of the current serious and violent felony convictions were committed on the same occasion.  Therefore, section 667, subdivision (c) did not require that the trial court impose consecutive sentences.  Rather, the trial court retained discretion to impose either concurrent or consecutive sentences on the convictions.

Appellant interpreted the trial court's comments at the sentencing hearing to mean that the court did not recognize that it had discretion to impose the sentences in counts 1 and 4 concurrently rather than consecutively.  Appellant points to the court's remarks "I don't have a whole lot of discretion here," "as required under the Penal Code," and "again, statutorily required," as evidence that it failed to understand it had discretion to impose concurrent rather than consecutive sentences on counts 1 and 4.  We do not agree.

The trial court's statement that it did not have "a whole lot of discretion here" was not specific.  In context, it referred to the aggravating circumstances and the lack of any mitigating factors.  The trial court followed its statement with a description of the circumstances in aggravation, while finding no circumstances in mitigation.  Also when viewed in context, the trial court's statements "as required under the Penal Code," and "again, statutorily required" referred to its lack of discretion in imposing a term of 25 years to life as to each individual count rather than a lack of discretion in imposing consecutive rather than concurrent sentences.

Accordingly, in our view, appellant has failed to demonstrate that the trial court did not understand that it had discretion in imposing consecutive rather than concurrent sentences.  A trial court is presumed to be aware of and have followed the applicable law in imposing sentence.  (*People v. Mosley* (1997) 53 Cal.App.4th 489, 496.)  In order to overcome this presumption, appellant must affirmatively demonstrate error.  (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573.)

### B. The Section 667, subdivision (a) five-year enhancements

At sentencing, appellant admitted five prior felony convictions, four of which qualified as serious felonies for purposes of section 667, subdivision (a) sentencing enhancements. Appellant's prior conviction in case No. F4901842 was dated August 11, 2006, for a violation of section 12021, subdivision (a). The conviction does not qualify as a serious felony for the purposes of section 667, subdivision (a) because it is not listed as a serious felony in section 1192.7, subdivision (c). However, as appellant points out and the Attorney General concedes, the trial court imposed five-year enhancements under section 667, subdivision (a)(1) based on all five of his prior felony convictions including, the one from case No. F4901842. Accordingly, the judgment should be modified to strike the five-year enhancement under section 667, subdivision (a) imposed for the conviction in case No. F4901842.

### C. The Imposition of Fines, Fees and Assessments

The abstract of judgment in this case reflects the imposition of a $280 restitution fine and a $280 parole revocation fine. The trial court, however, at sentencing did not orally impose a restitution fine under section 1202.4, subdivision (b) or a parole revocation fine under section 1202.45. In addition, the prosecutor did not object to the court's failure to impose the fines.

Before this court, appellant argues that the restitution fine and the parole revocation fine must be stricken from the judgment because they were not imposed by the court at sentencing, and that the prosecutor's failure to object constitutes a forfeiture of the issue. The Attorney General agrees. When there is a discrepancy between the court's oral pronouncement and the minute order or abstract of judgment, the oral pronouncement controls. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185-186.) Accordingly the judgment must be modified to strike the $280 restitution fine and the $280 parole revocation fine.

Respondent also argues that the judgment should be modified to include a court security fee and criminal conviction assessment that the trial court failed to assess. Section 1465.8, subdivision (a)(1), requires a $40 court security fee shall be imposed on

25

every conviction for a criminal offense. The fee is mandatory, and must be imposed for each of the convicted offenses. (*People v. Schoeb* (2005) 132 Cal.App.4th 861, 865.) In this case, the trial court imposed only one $40 fee, notwithstanding appellant's conviction on two separate counts. As such, the judgment must be modified to reflect the imposition of a total of $80 in court security fees.

Likewise only one criminal conviction assessment was imposed under Government Code section 70373. Government Code section 70373, subdivision (a)(1), provides that an "assessment shall be imposed in the amount of thirty dollars ($30) for each misdemeanor or felony." This fee is also mandatory. In this case, the trial court only imposed one $30 fee, notwithstanding appellant's conviction on two separate counts. As such, the judgment must be modified to reflect the imposition of two such assessments, for a total of $60 in criminal conviction assessments.

## *DISPOSITION*

We conditionally reverse the judgment and remand this matter to permit the trial court to conduct an *in camera* review of the police personnel records limited to the police officers and evidence as described in this opinion. If the trial court's *in camera* inspection reveals no relevant information, the trial court must reinstate the judgment. If the inspection reveals relevant information, the trial court must order disclosure, allow appellant an opportunity to demonstrate prejudice, and order a new trial if there is a reasonable probability the outcome would have been different had the information been disclosed. If no prejudice is shown, the trial court is to reinstate the judgment of conviction.

If the court reinstates the judgment, the court is directed: (1) to strike the five-year enhancement under section 667, subdivision (a) imposed for the prior conviction in case No. F4901842; (2) to strike the restitution fine and parole revocation fine; and (3) to impose additional court security fees and criminal conviction assessments as described in this opinion. Thereafter the superior court is directed to prepare an amended abstract of

26

judgment and forward a certified copy of same to the Department of Corrections and Rehabilitation.

                                        **WOODS, J.**

**We concur:**


        **PERLUSS, P. J.**


        **ZELON, J.**